Romeo A. ROUSSEL and Eileen J. Roussel

v.

STATE of Maine, Dr. Dean H. Fisher, Commissioner of Health and Welfare.

Supreme Judicial Court of Maine.

March 3, 1971.

Edward C. Dalton, Jr., Falmouth, for plaintiffs.

Janice M. Lynch, Asst. Atty. Gen., Augusta, for defendants.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE and WERNICK, JJ.

WERNICK, Justice.

Petitioners—plaintiffs, husband and wife, (hereinafter designated Roussels) have appealed to this Court from a final judgment of a single Justice sitting in the Superior Court. The judgment dismissed Roussels' petition for a writ of habeas corpus and their complaint, conjoined with

the petition, seeking a declaratory judgment and coercive relief by injunction.

To achieve habeas corpus remedy, Roussels allege that on or about February 20, 1964 the child, then three weeks of age and already a legal ward of the State, had been placed in their home in Portland, Maine, by the Department of Health and Welfare under the State's so-called foster-home placement program.[1] The child had remained with Roussels continuously thereafter for four and one half years until, on August 22, 1968, representatives of the defendant Commissioner of Health and Welfare removed her from the Roussels' home. The child has never been returned to them even though Roussels, as they allege, "made continuous demands for the return of custody." Roussels delayed for approximately one and one half years after the child had been taken from their home before they initiated, on February 25, 1970, the court proceedings with which we are presently concerned.

Roussels predicate their claim for habeas corpus relief upon allegations that for four and one half years they raised the girl "as their own", she "developed and grew to know [them] as her own natural parents", they ·

"had given the child their love and affection, reared her as their own child, presented to her the benefits of their adequate home and provided her with the necessary education and religious guidance."

On this basis, they have asked the Superior Court, under its *habeas corpus* jurisdiction, to evaluate the best interests of the child and adjudicate that her welfare requires that she be removed from the custody, (as a legal ward of the State), of the defendant Commissioner of Health and Welfare and that she be "placed in the care and custody of * * * petitioners."

Roussels have brought, additionally, an action for declaratory relief and injunction in which they incorporate the allegations of their petition for habeas corpus. They allege, further: (1) "passage of time" has "estopped," defendant Commissioner, and his agents, "from exercising any prior existing right of removal"; (2)

"the removal * * * from the home of plaintiffs was a deprivation of the liberty of the plaintiffs and [the child's] without due process of law, and a denial of the enjoyment of the civil rights of the plaintiff[s] and hence is unconstitutional and void";

and (3) the child having been allowed to remain

"in the home of plaintiffs from the age of three weeks to the age of four years, six months an implied contract to adopt in favor of plaintiffs"

had come into being which defendant Commissioner had dishonored "in removing [the child] from the home of plaintiffs." Contending that they have "no adequate remedy at law" and that danger persists that irreparable harm and injury will be done to the child if her removal from their home becomes final, Roussels have invoked a Superior Court jurisdiction, *other than habeas corpus,* (1) for the issuance of a declaratory judgment that

(a) "plaintiffs are entitled to * * * custody * * * until the child reaches her maturity" and (b) "a contract of adoption exists between plaintiffs and defendant * * * binding upon both parties";

and (2) for injunctive relief

(a) "to impel the defendant to return [the child] to the home of plaintiffs and to leave said child in the care, custody and control of plaintiffs until such time

1. In such foster home project "bills itemizing the expense of maintenance and education * * *, when approved by the department, shall be paid by the State as provided by law." 22 M.R.S.A. § 3794, as amended.

as the child is emancipated without further interference by defendant Commissioner", and (b) "compelling defendant to authorize the adoption of [the child] by plaintiffs, in accordance with their contract to adopt."

By granting a motion to dismiss filed by defendant Commissioner, the presiding Justice (1) sustained the position of defendant that the face of the petition revealed the inapplicability of habeas corpus jurisdiction, and (2) adjudicated that the complaint for declaratory judgment and injunctive relief, as directed to some *other jurisdiction* of the Superior Court, failed "to state a claim against defendant upon which relief can be granted."

We decide that the presiding Justice acted without error in dismissing both the petition for writ of habeas corpus and the complaint seeking declaratory judgment and injunctive relief.

We consider, first, the resort by Roussels to *habeas corpus* as a mechanism to have the Superior Court adjudicate that the right to custody of the child should be given to them. Counsel for Roussels commences with the foundational premise that:

"The development of Maine law shows clearly *habeas corpus* lies not only to obtain the release of an infant from an illegal detention, *but also to determine the right of custody.*" (emphasis supplied)

Counsel maintains that a showing by petitioners for habeas corpus that they have a pre-existing right to custody of the child is immaterial and unnecessary. He argues:

"* * * the focus of Maine law is not on the technical parties to the suit, but the paramount concern is the best interest of the child or children."

Immediately thereafter, however, counsel pronounces:

"*Equity* has not concerned itself with such dispute over custody in relation to the disputant, but rather has expressed its concern for the child." (emphasis supplied)

An initial intimation thus appears that the argument of counsel for Roussels rests upon an intermixing of the *habeas corpus* and the *equity* jurisdiction of Maine courts. Counsel seems to compound the confusion when he asserts:

"It is * * * clear that in Maine * * * the office of the Supreme Court has descended from King to *Chancery* and from *Chancery* to the Supreme Court and Single Justices of the Supreme Court. Regardless of the origination of *the power,* it should be clear * * * that foster parents * * * should have the right or standing to seek *habeas corpus,* since *this power* must be available * * * so that 'errors of heart or errors of judgment on the part of officers can be remedied by the Court'." (emphasis supplied)

The portions italicized reveal a repetition of the conception that when the control of infants is at issue, the *habeas corpus power* of Maine courts is to be deemed undifferentiated, and indistinguishable, from the *equity* power.[2]

2. Confusion of equity jurisdiction with other types of jurisdiction existing in courts by virtue of the Common Law is likely to occur because Maine has never had one court system exercising common law jurisdiction and another separate court system exercising equity (English Chancery) jurisdiction. In Maine, the same court has possessed both the common law and equity powers. The powers, however, are different even though they might be exercised by the same single court system, and the failure to recognize the differences in the jurisdictions in appropriate cases, if differences exist, will inevitably lead to serious errors. Furthermore, since December 1, 1959 when the promulgation of the Maine Rules of Civil Procedure eliminated the procedural differences which had previously existed in the exercise of the respective common law and equity jurisdictions by the

Because of the potential differences between habeas corpus and equity jurisdiction, especially as the differences might have critical impact upon the decision of the instant case, we find it necessary to recapitulate the historical development of the respective habeas corpus and equity jurisdictions in relation to the control of infants.

## THE HABEAS CORPUS JURISDICTION

Under the common law of England the words, "habeas corpus" referred to a plurality of writs serving different functions. They shared the common name "habeas corpus" because each of them achieved the same preliminary objective of having a person brought before a court or judge. Once the person had been produced, the further function of the tribunal became the basis for distinguishing the writs by supplemental designations. Accordingly, the writs of habeas corpus at common law were variously designated, inter alia, as habeas corpus "ad respondendum", "ad faciendum et recipiendum", "ad prosequendum", "ad satisfaciendum", "ad testificandum" and "ad subjiciendum et recipiendum."

"It was the last of these only, which was designed to procure liberation from illegal confinement.

\*   \*   \*   \*   \*   \*

"Employed to vindicate the right of personal liberty by whatever power infringed, it became inseparably associated with that right; and in proportion as the right was valued, so was the writ by which it was defended." Hurd, The Writ of Habeas Corpus (p. 144) (1858)

Thus, of the many writs of habeas corpus, one, the writ of *habeas corpus ad subjiciendum et recipiendum*, became identified as *The* Writ Of Habeas Corpus, the

so-called Great Writ of Liberty because its special function was to have a person produced before a court, or judge, to protect and vindicate his right of personal liberty by freeing him from illegal restraint.

As *the* "Great Writ" designed to accomplish summary release from illegal restraint whether governmental or otherwise, the writ of habeas corpus *ad subjiciendum et recipiendum* became utilized in England, prior to and during the colonization of America, in disputes over the physical control of infants. If a child old enough to be capable of resisting were being held by actual force, habeas corpus *ad subjiciendum et recipiendum* to free the child from the "imprisonment" or "restraint against his will", in the most literal sense of the words, was operative. Not so clear, however, might be the case of a child too young to resist or to withhold consent who might be held, without actual force, under one person's control rather than another's. In this situation "imprisonment" or "restraint", as commonly understood to involve a forceful or involuntary detention, might be deemed absent.

The courts, however, adapted the writ of habeas corpus *ad subjiciendum et recipiendum* to function in cases in which disputes occurred over the physical control of very young children. The technique employed was revealed by the statement of Patteson, J., in the case of Ex parte McClellan, 1 Dowl.P.C. 81 (1831).

"With respect to the argument, that some force or improper restraint must be used in order to authorize the court to remove an infant from \* \* \* any one, \* \* \* it is not necessary that any force or restraint should exist on the part of the person having \* \* \* the infant towards it." (p. 84)

same court, there is a stronger probability of error if we remain insensitive to significant differences between the traditional common law and equity jurisdictions.

As Hurd observes:

"In the case of infants *an unauthorized absence from the legal custody* has been treated, * .* * as equivalent to imprisonment; and the *duty of returning* * * *, as equivalent to *a wish to be free.*" Hurd, The Writ of Habeas Corpus, (p. 454) (1858) (emphasis supplied)

The logic by which the writ of habeas corpus *ad subjiciendum et recipiendum* was adapted to operate in cases in which infants were being held without force or violence generated the foundational and essential principle that petitioner must show himself to be the person having the pre-existing *right* to the custody of the infant in order to call the function of habeas corpus into play. Unless, (force being absent) the petitioner be, at least prima facie, the legally entitled ·custodian to whom the infant is *presumed to wish to return* because of *legal duty to return,* no basis appears to establish the illegal restraint from which it is the office of habeas corpus *ad subjiciendum. et recipiendum* to provide release.

Further corroboration of this crucial point appears in another principle which had been developed by the English Common Law in relation to habeas corpus jurisdiction over the control of infants:

" * * * the question before the Court upon *habeas corpus* is whether the person is *in illegal custody without that person's consent.* * * * above the age of fourteen in the case of a boy, and above the age of sixteen in the case of a girl, the Court will inquire whether the child consents to be where it is; *and if the Court finds that the infant, no longer a child, but capable of consenting* * * * *is consenting to the place where it is, then the very ground of an application for a habeas corpus falls away.*" (emphasis supplied) In re Agar-Ellis, 24 Chancery 317, 326 (1883) (in which the court was dis-cussing the *common law* of habeas corpus).

We may now summarize the basic principles of the English law dealing with habeas corpus *ad subjiciendum et recipiendum* (hereinafter referred to simply as "habeas corpus" unless otherwise designated) concerning the control of infants. (1) The special and sole office of the writ of habeas corpus is to free the infant from illegal restraint. (2) In those situations in which the infant is being detained without force or violence an illegal restraint will, nevertheless, be held to exist if the infant be away from the person legally entitled to custody, without authorization, or without consent if the infant is of the age of discretion. (3) Hence, in cases in which there is no actual force or duress being used to detain the infant, the petitioner for habeas corpus must show that he is the person having the *legal right* to the custody of the infant—thereby to establish the illegal restraint of the infant which it is the office of habeas corpus to remove.

There was, additionally, a fourth principle developed from the fact that the unique function of the writ of habeas corpus was to provide a *summary* remedy. The courts held that they lacked power in summary proceedings to *adjudicate* any *change* in the *legal right* to custody or to guardianship of an infant since appellate rights might be endangered.[3]

The application of this latter principle appears most cogently in the cases of Rex v. DeManneville, 5 East 221 (1804) and Rex v. Greenhill, 4 Ad. & E. 624 (1836).

In Rex v. DeManneville an unweaned eight month old child, sought in habeas corpus by the mother, was allowed to remain with the father, the person *legally entitled* to custody. In arriving at the decision, the court rejected arguments of counsel predicated upon the best interests and welfare of the child that the child was

3. Ex parte Hopkins, 3 P.Wms. 152 (1732),—see the note thereto subjoined by the original publishers and designated [A].

"of very tender age, and considering that its removal from the mother deprived it of its accustomed proper nutriment, was an additional reason for restoring it to her possession, particularly when the father had obtained possession of it by force and stratagem, and in a manner so dangerous to it." (p. 223)

In the case of Rex v. Greenhill, 4 Ad. & E. 624 upon a habeas corpus brought by the adulterous father of three female children under the age of six years, the court concluded that the absence of the children from their father who had legal right to their custody constituted illegal restraint. The court, being satisfied that it lacked powers in habeas corpus to adjudicate a change in the *right* to custody, required the maternal grandmother to release the children.[4]

There has been suggestion in the literature that the decisions in Rex v. DeManneville and Rex v. Greenhill, supra, were too stringent reflections or applications of the established law of habeas corpus jurisdiction in cases dealing with the control of infants. It has been said that the cases of Rex v. Clarkson, 1 Strange 444 (1755), Rex v. Smith, 2 Strange 982 (1755) and Rex v. Delaval, 3 Burroughs 1434 (1764) indicated that the court in habeas corpus jurisdiction could exercise a "discretion" to adjudicate a change in the *legal right* to custody.

Careful analysis of these cases reveals, however, that such conception seems to be a misunderstanding and that Rex v. DeManneville and Rex v. Greenhill were decided in accordance with the existing law.

In Rex v. Clarkson the court properly discharged the function of habeas corpus by releasing the infant from illegal restraint constituted by the detention of the child, without authority, from the rightful custodian. The court said: "All we can do is to declare that she is at liberty to go where she pleases." The infant, having thus been given "privilege", then chose to go with the persons who had the legal right to her custody. There had been indication that her freedom to return might be impaired by conduct of other parties and the court added: "We will order our tipstaff to wait upon her home to her guardians." What was done, as was observed in the case of In re Kottman, 2 Hill C.R. 363 (So.Car.1833) was that the court had refrained from *ordering* a *delivery* of *possession* even to the legally entitled custodians and had acted only "to protect the infant in returning" after the infant, given privilege, had herself *chosen* to return to the legal guardians.

Similarly, in Rex v. Smith, supra, the court said of their jurisdiction under the writ of habeas corpus:

"Upon this writ they could only deliver him [the infant] out of the custody of the aunt and inform him he was at liberty to go where he pleased."

The boy, once set free (and who happened to be within a few weeks of the age of fourteen, the age of discretion) wished to return to his aunt. In practical effect, therefore, the father, the legally entitled custodian, remained deprived of that physical possession of the boy which was an incident of his legal right to custody. The court emphasized that such result was consistent with the function of habeas corpus. The court said:

" * * * the right of guardianship could not be determined in this summary way, and the father was not without other remedy. * * * or other actions,

---

4. It has been thought that the decision of Rex v. Greenhill, supra, was responsible for the enactment by Parliament in 1839 of The Infants Custody Act. (2 & 3 Vict. c. 54). By the authority of this statute a mother, living apart from her husband, and father of.her children, was given opportunity to seek relief in common law courts to allow her, in the best interests of her children, to be awarded the right to custody if the children were under the age of seven years and until such time as they became seven years of age.

that would properly bring the right of guardianship in question."

Thus, Rex v. Smith, discloses that the function of habeas corpus is only to release from illegal restraint. The court must refrain from adjudicating a *change* in the *right* to custody and is, further, without *duty* to enforce, or vindicate, the rights of the person having the legal right to custody by ordering delivery of *the physical possession of the infant* to such custodian.

Rex v. Delaval, supra, confirms this point. Lord Mansfield immediately avows the *duty* of the court in habeas corpus to inquire whether an improper restraint exists, and if it be found, to remove it. The "discretion" of which Lord Mansfield speaks, in a dictum, arises after the court finds an illegal restraint and releases the infant from it. The discretion is whether to allow the infant "privilege" to go as the infant chooses or whether, because of the infant's tender years or lack of capacity (or willingness) to make a wise judgment, the court should deny "privilege", and *without adjudicating* any *change* in the legal *right* to custody or guardianship, order a delivery of the *physical possession* of the infant to some person, as circumstances might suggest. If no delivery is ordered to the legally entitled custodian, he is left to other remedies to vindicate the incidents of his legal right to custody.

Thus, Rex v. Delaval, as Rex v. Smith, indicates only that habeas corpus may be an imperfect remedy for the legally entitled custodian to obtain the physical possession of the infant.[5] In habeas corpus the legally entitled custodian may succeed

in having an adjudication that the absence or detention of the infant away from him constitutes an illegal restraint from which the infant is released, but the rightful custodian may discover that habeas corpus is an insufficient remedy to deliver to him the physical possession of the infant.[6]

Such interpretation of Lord Mansfield's language in Rex v. Delaval, supra,—that the "discretion" in habeas corpus is only as to whether to make an order relating to temporary *physical possession* rather than to adjudicate changes in the legal rights to custody or guardianship—reveals that both the dictum and the actual decision (in which an eighteen year old girl having been found to be in fact illegally restrained by force, was allowed "privilege" to go at liberty as she pleased) are consistent with earlier cases as well as with the subsequent decisions, above discussed, of Rex v. De-Manneville and Rex v. Greenhill.

Before we leave the discussion of habeas corpus jurisdiction regarding the control of infants to consider the scope of equity jurisdiction, a final point should be mentioned to avoid possible confusion.

Since the application for the writ of habeas corpus could be brought before *any judge,* whether sitting in the common law courts or in the Chancery courts, *habeas corpus* proceedings regarding control of infants were often brought before judges of *Chancery* courts as well as the common law courts. If, however, a habeas corpus proceeding relating to the control of infants happened to be before a judge of the Chancery court, it was the Common Law of England rather than Chancery principles which governed the habeas cor-

---

5. Much confusion has resulted because of the use of the one word "custody", to signify two separate concepts: (1) the *actual* physical possession and control and (2) the *legal right* to the physical possession and control.

6. The New Jersey case of State v. Cheeseman, 5 N.J.L. 511 (1819) establishes the validity of this analysis in striking fashion. The court decided in habeas

corpus that the guardians were *legally entitled* to the infant. The majority of the court, however, exercised "discretion" to decline to order a delivery of the physical possession of the child to the legal guardians even though they were entitled to it. The dissenting judge thought that the court should order a delivery of physical possession to the guardians.

pus jurisdiction and scope. As was said by Brett, M.R., in the case of In re Agar-Ellis, 24 Chancery 317 (1883):

"* * * the application for a *habeas corpus* is no part of the law of equity as distinguished from the Common Law of *England.* * * * That seems to me to have been the rule, whether the *habeas corpus* was applied for to a Judge of the Court of Equity, or to a Judge of a Court of Common Law. All Judges had the duty of listening to such applications; and, when they had such an application for a *habeas corpus,* to my mind it is clear that they administered the same law, * * *. The law was administered in the same way by a Chancery Judge as by a Common Law Judge. Therefore, of course, the rules of equity, or the principles of equity as they are called, are not to prevail, because there is nothing for them to prevail over." (pp. 326, 327)

### THE CHANCERY (Equity) JURISDICTION

We now direct attention to an independent jurisdiction relating to the control of infants entirely separate and distinct from that of habeas corpus *ad subjiciendum et recipiendum*—a jurisdiction which reposed *exclusively* in the English Courts of Chancery.

The distinction between the traditional equity jurisdiction exercised by the English Chancery Courts and habeas corpus jurisdiction, (whether the habeas corpus was before a Common Law or a Chancery judge), is most cogently disclosed by a contrast of the two cases of Rex v. DeManneville, 5 East 221, (1804) decided by a Common Law Court, (the King's Bench), and DeManneville v. DeManneville, 10 Vesey Jr's 52 (1804) decided by the Chancery court.

Rex v. DeManneville, as we have seen in prior discussion, decided that the presence of the child with the father, the person legally entitled to custody, negatived il-legal restraint and, therefore, habeas corpus jurisdiction was inoperative.

Shortly after the habeas corpus decision by the King's Bench the mother filed a *petition* in Chancery. She asked the Chancellor to order the return of the eleven month old child to her and to award her the *right* to custody. This second proceeding in Chancery, instituted by *petition,* is the case of DeManneville v. DeManneville, supra.

Lord Chancellor Eldon said:

"The Court of King's Bench, when the child was brought up by *Habeas Corpus,* declined to interfere; and I am not surprised at it; *for that Court has not within it by its constitution any of that species of delegated authority, that exists in the King, as Parens Patriae; and resides in this Court, as representing his Majesty.* That application therefore failed, and the child was left in the custody of the father." (pp. 58, 59) (emphasis supplied)

Continuing, Lord Eldon observed that there was, however, an independent jurisdiction *in equity:*

"To control the right of the father, *prima facie,* to the person of the child", and
as to which

"In whatever principle that right is founded, it is unquestionably established; and is not disputed." (p. 63)

Lord Eldon inclined to the view that the principle on which this independent equity jurisdiction had been truly founded "does not go upon guardianship", and can be said to disclaim "wardships" and seems to be founded on the doctrine, enunciated by Lord Hardwicke in Butler v. Freeman, Ambler 301, " 'that the Court represents the King, as Parens Patriae' " a doctrine, says Lord Eldon, "that has been followed in many cases." (p. 63). In number one of the Reporter's notes to the Chancery case

of DeManneville v. DeManneville, it is stated:

"The King, as pater patriae, has the direction of infants, which charge is administered in his Court of Chancery; Cary v. Bertie, 2 Vern, 342; Eyre v. The Countess of Shaftesbury, 2 P.Wms. 119." (p. 66)

An excellent summary of this historic equity jurisdiction and the differentiation of it from habeas corpus jurisdiction, in relation to the control of infants, is found in the case of The Queen v. Gyngall 2 Q.B. 232, (1893). Lord Esher, M.R., carefully discusses the scope of the equity jurisdiction as follows:

"But there was another and an absolutely different and distinguishable jurisdiction, which has been exercised by the Court of Chancery from time immemorial. That was not a jurisdiction to determine rights as between a parent and a stranger, or as between a parent and a child. It was a paternal jurisdiction, a judicially administrative jurisdiction, in virtue of which the Chancery Court was put to act on behalf of The Crown, as being the guardian of all infants, in the place of a parent, and as if it were the parent of the child, thus superseding the natural guardianship of the parent." (p. 239)

In a leading American case Finlay v. Finlay, 240 N.Y. 429, 148 N.E. 624 (1925) Cardozo, J. reveals the nature of this original *equity* jurisdiction as being unconcerned with *adversary rights.*

"The chancellor in exercising his jurisdiction * * * does not proceed upon the theory that the petitioner, whether father or mother, has a cause of action against the other or indeed against any one. He acts as parens patriae to do what is best for the interest of the child. He is to put himself in the position of a 'wise, affectionate, and careful parent' * * *, and make pro-

vision for the child accordingly." (p. 626)

## THE LAW OF MAINE

Having thus examined in extensive detail the respective natures of the habeas corpus and equity jurisdictions, in relation to infants and their custody and control, we turn now to analysis of the development of the law of Maine in the light of these separate and independent jurisdictions.

Our starting point is the first reported case in Maine which deals with habeas corpus as to control of an infant—State v. Smith, 6 Me. 462 (1830).

It is to be emphasized that in 1830 the Supreme Judicial Court of Maine which decided State v. Smith lacked a full jurisdiction automatically carrying over from English Chancery. The court possessed only that limited equity jurisdiction explicitly conferred upon it by the Maine Legislature. In the year 1830, when State v. Smith was decided, the legislature had withheld from the court the equity powers relating to the control or custody of infants (as shown by R.S. of Me., 1841, c. 96, Sec. 10, which summarized the totality of the grant of equity powers from 1821 to 1841).

The Supreme Judicial Court of Maine itself recognized this limitation of its jurisdiction when the court said in State v. Smith, in referring to some of the English Chancery decisions:

"These authorities are not cited as precedents for a *common law court,* but they do establish the fact that the right to control parental authority has been claimed and exercised by the *appropriate* court *in England* for more than a century." (pp. 464, 465) (emphasis supplied)

The implication is apparent that the court was considering itself a common law court in dealing with the matter before it and was, therefore, citing Chancery cases merely to illustrate *an equity jurisdiction* which it, (as well as the common law courts of

England) lacked but which the *Chancery Courts of England* possessed.

In State v. Smith the father, as the statutes of Maine then permitted, had transferred the legal right to custody of his children to their mother, his wife, while he and his wife continued to live apart. The father's petition for habeas corpus thus failed because illegal restraint of the children was non-existent. This decision in State v. Smith is consistent with, and applies, the then established law that a petitioner for habeas corpus, in relation to the control of infants, who fails to show a pre-existing legal right to their custody, (absent a showing of actual force used to restrain the children), ipso facto fails to establish the element of illegal restraint which is indispensable to the functioning of habeas corpus.

It is the presence of other language in State v. Smith, offered as an alternative approach, which has engendered extensions, more apparent than real, of the precise scope under Maine law of habeas corpus jurisdiction in relation to the control of infants.

To the extent that the court in State v. Smith stated that under *habeas corpus jurisdiction*

"it is in the sound discretion of the court to alter the custody * * * or not" (p. 468)

the court must be deemed to have been referring only to a "discretion" to give the infant the "privilege" of being free to go as he pleases or to allow temporary physical possession of the infant to remain where it had been, leaving the legally entitled custodian to vindicate his right to physical possession of the infant through other remedies. Consistently with the then well-established law the court would be inaccurate were it claiming a power in

*habeas corpus* to adjudicate *changes* in *rights* to custody or guardianship. As we have elucidated previously, the only valid significance which can be attached to the "discretion" mentioned by Lord Mansfield in Rex v. Delaval, or which appeared to have been utilized in Rex v. Smith, is a "discretion" of the court, once an illegal restraint of the infant appears, and even though the court lacks power to adjudicate a *change* in the *right* to custody or of guardianship, to decline to give an infant of tender years the "privilege" to go at will or to deliver physical possession of the infant to the legally entitled custodian.

Furthermore, the comment in State v. Smith that the court will "endeavor, as far as possible, to administer a conscientious parental duty with reference to * * welfare" of the infant [7] is an obvious reference to the "parens patriae" jurisdiction over infants which had been reposed, *only* and *uniquely,* in courts *possessed of full Chancery powers.* This point becomes abundantly clear from the fact that Judge Story himself in United States v. Green (the case from which the court was quoting) made his remarks relying upon statements of Lord Eldon in DeManneville v. DeManneville as to the powers of a *Court of Chancery* to exercise "the authority of the king, as 'parens patriae'" (p. 486).

We, therefore, now clarify State v. Smith as a decision that (1) habeas corpus in relation to the control of infants (who are being detained without actual force against them) must be brought by a person having a pre-existing legal right to the custody of the infant—otherwise illegal restraint is missing and habeas corpus has no function to perform; and (2) because the father who sought the habeas corpus relief had lawfully transferred his right to the custody of the children, he had failed to establish an illegal restraint of the chil-

---

7. Quoted from United States v. Green, 3 Mason 484 (1824) as a part of comments made by Story, J., in reference to a motion for attachment, in the nature of contempt, against a defendant in a habeas corpus proceeding who had failed to produce a ten year old child before the court.

dren upon which habeas corpus could operate to accomplish a release.

The additional language contained in the opinion in State v. Smith is to be treated as expressions of dicta which refer to the power of those courts *in which full equity jurisdiction reposes*—and which the court in State v. Smith lacked—to alter the *right* to the custody of infants, predicated upon the welfare of the children.

From the time of the decision of State v. Smith in 1830 no significant case dealing with habeas corpus in relation to control of infants appears in the Maine Reports until 1942 when Merchant v. Bussell, 139 Me. 118, 27 A.2d 816 (1942) was decided. During the interval there had been developments in the law of Maine relating to the custody and control of infants. After 1895 (P.L.1895, Ch. 43) the parents of children "jointly have care and custody of the person of their minor children"; and before 1942 there had been added the further prescription that: "Neither parent has any right paramount to the rights of the other." P.L.1927, Ch. 78. Furthermore, if parents were living apart, as of 1942 the Probate Court had already been empowered to adjudicate rights to custody between the parents. (Later, in 1945 the Superior Court was given similar jurisdiction concurrent with the Probate Court. P.L.1945, Ch. 303).

Finally, in 1874 the legislature had seen fit to confer upon the Supreme Judicial Court

"full equity jurisdiction according to the usage and practice of courts of equity in all * * * cases where there is not a plain, adequate and complete remedy at law"

such equity jurisdiction to be in addition to that conferred in the *specific* instances previously mentioned in the statutes. (P.L. 1874, Ch. 175). Commencing with 1930,

the Superior Court had been granted full equity jurisdiction concurrently with the Supreme Judicial Court. (R.S.1930, Chapter 91, §§ 35, 36).[8]

In Merchant v. Bussell a father petitioned for a writ of habeas corpus to regain the physical possession of his four year old daughter whom he had left with her maternal grandmother shortly after the child had been born and her mother had died in childbirth. It is clear that by virtue of the Maine statute, supra, (the mother having died), (as well as the common law), the father had the *pre-existing legal right* to the custody of the child. On the principle that the detention of the child away from him, the legally entitled custodian, was an illegal restraint because in contravention of the child's wish to return to him—(a wish presumed to exist because of her legal obligation to return),—the court in habeas corpus was under a duty to acknowledge the *illegal* restraint. At the same time, however, the court was *free* of *obligation,* as an incident of habeas corpus jurisdiction, to order that the physical possession of the child be delivered to the father.

In Merchant v. Bussell, however, the court utilized its "discretion" in habeas corpus not merely to refrain from delivering physical possession of the child to the father but also to effect a *change* of the *legal right* to custody. The court justified such action by invoking "parens patriae" powers. In support of its authority to alter the legal right to custody, the court said:

"* * * courts act in this behalf *solely* upon the assertion of *the right of the sovereign* whose power they administer to continue or change the custody of the child at his discretion, as *parens patriae,* * * *" (p. 121, 27 A.2d p. 819) (emphasis supplied)

8. This concurrent full equity jurisdiction of the Superior and Supreme Judicial Courts continued in force and effect until 1959 when the Supreme Judicial Court was deprived by statute of jurisdiction in equity.

In view of the analysis previously developed, it is manifest that the court in Merchant v. Bussell had really transformed a proceeding which had been initiated to invoke habeas corpus jurisdiction into an *equity* proceeding. Only such explanation renders the case consistent with the indisputable proposition that "parens patriae" powers to change the right to the custody of infants had been reposed solely and uniquely in courts having full equity jurisdiction. Courts having common law habeas corpus powers, but lacking full equity jurisdiction, were without authority to utilize the powers of the sovereign as "parens patriae."

■ This technique employed in Merchant v. Bussell, of calling upon an equity jurisdiction to reach an ultimate decision of the case, was within the court's authority since, in 1942, as had been the situation since 1930, the Superior Court had been granted full equity jurisdiction. We interpret Merchant v. Bussell, therefore, insofar as it adjudicated a *change* of the *legal right* to the custody of the child in a proceeding which had originated as habeas corpus, as an election by the court to exercise *equity* jurisdiction rather than as an appropriate discharge of habeas corpus jurisdiction. We now reaffirm the common law that a court lacks power when an infant is produced before it *under habeas corpus jurisdiction* to adjudicate a *change* in the *legal right* to the custody of the child predicated upon the paramount consideration of the best interests of the child. Such *change* of the *right* to custody, in the absence of statute otherwise providing, may be accomplished only as an incident of *equity* jurisdiction in which the court is exercising a power passed from King to Chancellor and from Chancellor to a court upon which full equity jurisdiction has been conferred.

■ Merchant v. Bussell thus stands for the following propositions: (1) a person who shows himself to have a *pre-existing legal right* to the custody of an infant properly invokes habeas corpus jurisdiction to seek to achieve the objective of the writ of habeas corpus—a release of the infant from illegal restraint; (2) in the exercise of *this habeas corpus jurisdiction* the court lacks power to inject considerations of the best interests, or the general welfare of the child, to adjudicate *changes* in the *legal right* to custody, since in habeas corpus the court acts only to ascertain whether there is an illegal restraint of the child constituted (in the absence of actual force upon the child) by the child's being detained in contravention of the *rights* of the legally entitled custodian; (3) even though, however, the court in the exercise of *the habeas corpus jurisdiction* is satisfied that the petitioner has established his legal right to custody and the resulting illegal restraint of the child, (constituted by the child's being withheld), the court, under habeas corpus jurisdiction, is *free* of a *duty* to deliver the physical possession of the child to the legally entitled custodian; (4) the court has a *discretion*, if an illegal restraint exists, to decide whether to put the child at liberty by giving the child "privilege", or if the child be of tender years, or otherwise shown to be incapable of using sound judgment, the court may choose to deliver the temporary physical possession of the child to the legally entitled custodian, or to leave the physical possession as it was or deliver it to some other person, *without, however, adjudicating* any *change* in the *legal rights* to custody; and finally (5) if the habeas corpus proceedings have been properly instituted in the first instance by a person showing himself *legally entitled* to custody of the infant and the court happens to have, in addition to common law jurisdiction, full *equity* jurisdiction, the court has discretion, *without obligation*, to lay aside its habeas corpus powers and to bring into play its *equity* jurisdiction, acting as parens patriae, to evaluate the best interests of the child and to adjudicate, if appropriate, changes in the *right* to custody as an in-

cident of the exercise of the equity jurisdiction.[9]

In Merchant v. Bussell it was the court's ultimate resort to proposition (5) above—the utilization, at its election, of the independent equity jurisdiction under which the court could act as parens patriae and make the welfare of the child, rather than the legal right of the parent, the paramount consideration—which justifies the decision of the case.[10]

The foregoing clarification of the decision in Merchant v. Bussell likewise applies to the subsequent habeas corpus cases relating to infants, of Stanley v. Penley et al., 142 Me. 78, 46 A.2d 710 (1946) and Blue v. Boisvert, 143 Me. 173, 57 A.2d 498 (1948).

Stanley v. Penley is to be considered as holding that the father of a three and one-half year old son, as the person *legally entitled* to his custody (the mother having died), prevailed in habeas corpus because the Superior Court saw no circumstances inducing it to elect to exercise its equity jurisdiction as parens patriae and adjudicate a change of the legal right to custody. In the exercise of its habeas corpus jurisdiction to free the child from the illegal restraint, constituted by the child's being detained away from the person having the *legal right* to its custody, the court used its discretion, because the child was three and one-half years of age, to refrain from giving the child "privilege" to go at large and chose to deliver the physical possession of the child to his father, the rightful custodian.

Blue v. Boisvert is to be interpreted as *deciding* that the writ of habeas corpus sought by the petitioners who alleged themselves to be the adoptive parents of the child and, as such, possessed of the *legal*

9. The precise approach is illustrated in The Queen v. Gyngall, 2 Q.B. 232 (1893) as a result of the powers conferred on the Queen's Bench courts by the Judicature Act of 1873. (36 & 37 Vict. c. 66, Sections 16, 25, subsection 10).

   At this juncture it should be noted that since 1959 the Supreme Judicial Court of Maine lacks equity jurisdiction. Hence, if a habeas corpus proceeding relating to the control of an infant were instituted in the Supreme Judicial Court, the Supreme Judicial Court lacking equity jurisdiction, would, therefore, be without power to adjudicate changes in the right to custody predicated upon the paramount consideration of the child's best interests.

10. We are aware that many courts in the United States have authorized the use of habeas corpus jurisdiction as the appropriate vehicle to achieve adjudications of changes in the *rights* to custody and guardianship of infants. Some courts have had the benefit of statutory assistance in limited areas. Other courts have assumed the authority solely through the judicial process by extending Lord Mansfield's dictum in Rex v. Delaval, supra, beyond its originally intended scope and application to avoid the strictures of hard cases in which confinement of habeas corpus within the limits of its traditional nature and function might yield consequences difficult for

the "conscience." Such courts seem to have become embroiled in the apparent unfairness of denying access in habeas corpus to a person lacking pre-existing right to custody, even though such person has had a close relationship with the child, thereby retaining an aspect of rigidity of traditional habeas corpus—[although Nebraska seems to have surrendered even this last vestige of the original habeas corpus conceptual logic, Hausman v. Shields, 184 Neb. 88, 165 N.W.2d 581 (1969)]—and, simultaneously, of entertaining issues so foreign and collateral to the essential nature of habeas corpus as to supplement adjudications changing legal rights to custody and guardianship with orders for support and maintenance of children. (See: Bartlett v. Bartlett, 175 Or. 215, 152 P.2d 402 (1944) and especially the discussion continually intermixing habeas corpus and equity at pp. 402–412).

   We prefer to attempt to maintain conceptual clarity and to seek to elucidate Maine law as adhering to the traditional common law limits of habeas corpus jurisdiction in relation to the control of infants and to avoid confusion and potential error by leaving possible *inequities* to be remedied *in equity*—in accordance with the inherent broad flexibility of equity jurisdiction and the time-honored special prerogative of Chancery, uniquely fitted for infant custody problems, to act for the sovereign as parens patriae.

*right* to the custody of the then eight year old boy, Robert Boisvert, was *"quashed"* because the proof established that the adoption was a nullity and thereby eliminated the *legal right* of the petitioners to custody —this legal right to custody being an indispensable element to the proof of the illegal restraint of the child upon which alone habeas corpus can operate. [Also: In re David, Me., 256 A.2d 583 (1969).]

The many statements of the opinion in Blue v. Boisvert as to the "paramount interest of the child" may be regarded as dicta which describe the *equity jurisdiction* of the Superior Court to act as parens patriae—a jurisdiction which could have been invoked, in the exercise of discretion by the court below, even had the court below been correct in its holding that the adoption was valid. As the opinion states:

"The court [below] considered only the fact that the petitioners were the adoptive parents and that their right to custody was absolute because of the decree of adoption issued by the Probate Court. This was the ground on which the petitioners based their right to the custody of the minor in their petition praying for the issuance of the writ of *habeas corpus*." (p. 184 of 143 Me., p. 504 of 57 A.2d)

The dicta of the opinion, referring to the equity powers of the court to evaluate the best interests of the child as paramount, are to be taken as directed to the lower court's assumption that the power of the Superior Court had been exhausted once, as the lower court saw the matter, the petitioners' *legal right* to custody had been established by a valid adoption. The dicta describing the paramount interests of the child constitute a reminder that the court below had an *equity* jurisdiction as parens patriae, if it *chose* to utilize it, to consider the best interests of the child and to override the legal right to custody established by the petitioners for habeas corpus.[11]

In the light of the foregoing exhaustive review of the law governing the respective separate and independent habeas corpus and equity jurisdictions relating to the control of infants, we now focus attention upon decision of the case at bar.

■ The court below correctly dismissed the petition of the Roussels for writ of habeas corpus. The face of the petition reveals that Roussels lacked any pre-existing legal right to the custody of the child. In the absence of a showing of such pre-existing legal right there is missing the essential element (no force or violence toward the child being involved) upon which the *habeas corpus jurisdiction* of the Superior Court, in relation to the control of infants, can function—namely, an illegal restraint of the child constituted by the detention of the child away from the person having the *legal right* to custody.[12]

The correct dismissal of the petition for habeas corpus, in view of the posture of the pleadings in the case at bar, is insufficient, however, finally to resolve the issue concerning the best interests of the child and the claim of Roussels to be awarded the right to her custody. Roussels, in an abundance of caution, have wisely chosen to supplement their petition for habeas corpus by filing, additionally, a *complaint* as a part of which they present the same allegations as were contained in the peti-

---

11. The court will be subjected to a *duty*, rather than a *choice*, of acting under its equity jurisdiction to adjudicate the change of legal right to custody if the respondent in the habeas corpus proceeding should file a *counter-petition* addressed to the original equity jurisdiction of the court as parens patriae.

12. 14 M.R.S.A. § 5510, authorizing habeas corpus relief by the "parent or guardian" in relation to "any minor imprisoned or restrained of his liberty" is a confirmation of this fundamental principle. The statute is to be deemed to be thus partially corroborative rather than exhaustive or exclusive and, hence, would be without effect to deny habeas corpus to one, *other than a parent or guardian*, who by virtue of court award, or otherwise, possesses the *legal right* to the custody of the minor.

tion for habeas corpus. In these allegations Roussels maintain that the best interests of the child demand that the court adjudicate their right to the legal custody of the child.

This filing of a complaint addressed to the Superior Court constitutes a direct invocation of the Superior Court's original jurisdiction *in equity*. Such equity jurisdiction, as the prior discussion has established, is a jurisdiction of the court, derived from historically established Chancery usage, practice and power, to act on behalf of the sovereign as parens patriae and to adjudicate rights to the custody of infants guided by the paramount consideration of the dictates of the welfare of the child.[13] As Judge Cardozo recognized in Finlay v. Finlay, supra, the court under this equity jurisdiction

"* * * may act at the intervention or on the motion of a kinsman, * * * but equally he may act at the instance of any one else." (p. 626, of 148 N.E.)

The Superior Court, therefore, by virtue of the statutory grant to it of

"full equity jurisdiction, according to the usage and practice of courts of equity,

* * * where there is not a plain, adequate and complete remedy at law" (14 M.R.S.A. § 6051, subsection 13)

possesses the jurisdiction which Roussels have purported to invoke provided that— (there being no *specific* legislative grant of equity power in relation to the custody of infants)—it is correct, as Roussels allege, that they lack "a plain, adequate and complete remedy at law." [14] Such allegation is sustained by the fact that their habeas corpus petition had been correctly dismissed because they lacked a pre-existing right to custody; and there is available to them nothing under specific statutory authorizations pertaining to the adjudication of rights to custody of minor children.

We decide, therefore, that Roussels being without a plain, adequate and complete remedy at law are entitled to seek relief, by resort to the equity jurisdiction of the Superior Court, to have an adjudication of their *right* to the custody of the child in the light of the best interests of the infant, provided that Roussels have correctly initiated the proceeding to call such equity jurisdiction into play.

In this connection we recognize that the reported cases in Maine reveal that rarely,

13. We intimate no opinion, and none is to be inferred from what is herein stated, on the question of whether, had the Roussels *confined* the pleadings to the filing of a petition for habeas corpus, their failure to show a pre-existing right to legal custody requiring the dismissal of the habeas corpus petition would have precluded the Superior Court from going further and *on its own motion* bringing into play the equity jurisdiction to evaluate the best interests of the child.

On this issue cases such as People ex rel. K—— v. Commissioner of Welfare of City of New York, Sup., 104 N.Y.S.2d 939 (1951) and In re Harper, 2 Ir. (Irish) R. 571 (1895) reveal the opposing points of view.

The case of Kurtis v. Ballou et al., 33 A.D.2d 1034, 308 N.Y.S.2d 770, is without bearing upon the question discussed in this footnote. In that case the habeas corpus proceeding had been initiated by the Commissioner of Social Services against the foster parents. The Commissioner was the person having *the pre-existing legal right to the custody*, and the

resort by the court to its equity jurisdiction as parens patriae to allow consideration of the best interests of the child to enter and thereby require a hearing exemplifies the principle to which we have already adverted in our analysis of the Maine case of Merchant v. Bussell, supra.

This Court in the case of In re David, Me., 256 A.2d 583 (1969) omitted explicit discussion of the issue considered in this footnote. The Court did refrain, however, from asserting that the Superior Court, had power, on its own motion, to invoke its equity jurisdiction regardless of the fact that the mother of the child had failed in the *habeas corpus* proceeding to establish her legal right to custody.

14. It is to be emphasized, by way of illustration, that 22 M.R.S.A. Ch. 1055 dealing with the custody of children specifically in relation to the State Department of Health & Welfare provides independent remedies at law which are plain, adequate and complete, especially in Sections 3792, 3793 and 3798.

if ever, has there been a direct undertaking to call upon the original equity jurisdiction of Maine courts, as it had been granted after 1874, in relation to the adjudication of the rights to custody of infants. Hence, we take this occasion to delineate the appropriate procedure to invoke, as well as the substantive principles controlling, the exercise of such equity jurisdiction.

We believe that both the procedure and the substance have been clearly promulgated by Judge Cardozo, as the result of his analysis of leading English cases, in the New York case of Finlay v. Finlay, 240 N.Y. 429, 148 N.E. 624 (1925).

Procedurally,

"It is *not* a remedy *by suit*. It is a remedy by *petition*. The distinction is implicit and fundamental alike in the genesis of the jurisdiction and in its subsequent development." (p. 626) (emphasis supplied)

"The remedy by *action* is * * * incongruous in principle. It is more than that, however; it is cumbrous, expensive, and dilatory in practice. There must be pleadings and notices of trial and crowded calendars and formal proofs. The remedy by *petition* is summary and cheap and swift. It comes to us established and consecrated by tradition and practice immemorial." (p. 626) (emphasis supplied)

■ We agree with the *decision* in Finlay v. Finlay, based on *procedural* considerations, that the *original* equity jurisdiction to adjudicate changes in the rights to the custody of infants is improperly invoked by a complaint which initiates a *plenary civil action.*

"We are unwilling to displace it [the remedy by *petition*] by a less efficient innovation." (p. 626)

Under this holding as to the correct procedure, the filing of a complaint by which Roussels have commenced a plenary civil action is improper. The dismissal of this aspect of the complaint by the presiding Justice could be justified, therefore, solely on procedural grounds and regardless of other considerations.

The present matter, however, has precipitated issues and is resulting in a decision which is enunciating principles which have been infrequently, if ever, sharply and completely delineated in the reported cases of this State. We choose, therefore, to decide the present case by disregarding that Roussels undertook to achieve relief *in equity*, to change the right of custody of an infant, by instituting a plenary civil action. (This leniency extended because of the unique circumstances of this case, we emphasize, is without significance as future precedent.)

Treating the complaint as if it were, in part, a *petition* in equity seeking a change of the legal right to custody, we learn from the allegations and matters appearing on the face of the pleadings that the child had been away from the Roussels for a year and a half during which time there was a complete lack of contact and communication between Roussels and the child. It was after this unusually long separation that Roussels elected to seek the intervention of the equity jurisdiction of the Superior Court. This point becomes the critical basis upon which the ruling of the court below dismissing this aspect of the claims of Roussels, without hearing, is to be evaluated.

■ In the discharge of his function to exercise an original *equity* jurisdiction relating to the custody of infants, the presiding Justice applies *substantive principles* which, as we have previously stated, are well formulated in Finlay v. Finlay, supra, as follows:

"The chancellor * * * does not proceed upon the theory that the petitioner, * * *, has a cause of action * * * against any one. He acts as *parens patriae* to do what is best for the interest of the child. He is to put himself in the position of a '*wise, affectionate, and*

*careful parent' * * *,* and make provision for the child accordingly. * * * *He is not adjudicating a controversy between adversary parties, to compose their private differences.* He is not determining rights 'as between a parent and a child,' or as between one parent and another. * * * *He 'interferes for the protection of infants, qua infants, by virtue of the prerogative which belongs to the Crown as parens patriae.'"* (p. 626) (emphasis supplied)

■ A single Justice who is asked to act as a "wise, affectionate, and careful parent" to do "what is best for the interest of the child" must be held to be invested with a broad discretion. Appellate review of his decision must be confined, therefore, to the question of whether the presiding Justice was guilty of error to the extent that he committed an abuse of his discretion.

■ In the present case the fact alone that there had been a period of a year and a half during which arrangements for the child had been made by representatives of the Commissioner of Health and Welfare outside the home of Roussels and that Roussels had been entirely without contact or communication with the child during that period,—(without allegations by Roussels to show that the child's mental, physical or emotional condition was known by them to have deteriorated, or otherwise to have become impaired, at the time of the commencement of the proceedings, or disclosing specific circumstances which had occurred during the interval of separation indicating a strong likelihood that the child was in danger of mental, physical or emotional harm,)—constituted a sufficient justification for a conclusion by the presiding Justice, without need for hearing, that

the best interests of the child would be served by leaving the existing situation untouched by judicial interference.[15]

The presiding Justice acted without error in dismissing that aspect of the proceedings in which the Roussels sought the intervention of the original equity jurisdiction of the court, as parens patriae, to adjudicate that the legal right to custody of the child should be awarded to them.

■ Other theories of Roussels promulgated in their complaint and which are founded on the length of time in which Roussels participated in the foster-home placement program with reference to the child in question, lack support in reason or authority. The claims that the "mere passage of time", of four and one half years during which the Roussels had the child under the foster-home placement program, creates an "estoppel" depriving the legally entitled custodian of legal rights, or furnishes a basis for an "implied contract" of adoption, are startling and unjustified enlargements of any recognized legal principles of which this court is aware. The attempt of Roussels to predicate "estoppel" and "implied contract" on the "mere passage of time"—without accompanying allegations that the defendant Commissioner made promises to them or otherwise acted by affirmative conduct to induce them to believe that they were being given potential rights to custody or adoption upon which they had explicitly relied to their detriment—represents a departure from, and unreasonable extension of, any legal theory of "estoppel in pais" or of "promissory estoppel" which has come to our attention. Counsel for Roussels has failed to provide us with any authority having the slightest tendency to support these contentions. We hold them to be without merit.

15. This basis of decision has nothing to do with the doctrine of "laches" which is operative when invoked as *an affirmative defense* to a *cause of action* between *adversary parties* asserted in a *plenary civil suit* in equity. Here, we are considering only whether there was an abuse of discretion by a presiding Justice acting to decide, in a proceeding *summary* in nature, the best interests of a child, rather than to adjudicate the merits of a cause of action in a controversy between adversary parties asserting adversary rights against each other.

■ Likewise novel and lacking the support of direct authority or strong analogy, as well as potentially disastrous in their practical consequences, are the contentions of Roussells that the length of time during which they participated in the State's foster-home placement program as to the child in question conferred upon them (or the child), ipso facto, legal rights of a level sufficient to bring them within the coverage of minimal procedural due process requirements or of the equal protection of the laws or of the protection of civil liberties guaranties. No authorities cited by Roussels, or any which have come to our attention, come close to suggesting the existence of such legal rights on the bases asserted by Roussels.

The unreported Connecticut case decided in the United States District Court in 1969 and cited in the brief of Roussels—James v. McLinden et al.[16]—is inapposite. This decision holds only that when the State has *yet to acquire* the legal right to the custody of a child and has instituted a legal proceeding to be awarded the legal right of custody, a person who has acted toward the child "in loco parentis" has sufficient relationship to the child to participate in the hearing. This proposition is a far cry, indeed, from the contention of Roussels in the present case that even though the State *already possesses* the *legal right* to the custody of the child and has placed the child, as a ward of the State, under a foster-home placement program, Roussels, because they have been participants in the foster-home placement program with relation to the child, must be afforded a judicial hearing before the State may, acting without force, fraud or trespass, assert and act upon its legal rights as the child's legal custodian and guardian.

The requirement of a judicial hearing as asserted by Roussels is thus without support in any decided cases which have come to our attention. We see nothing in reason or policy to suggest its approval. We reject the argument in principle because it unreasonably impairs the freedom of action which must be reposed in any person legally entitled to the custody of a child and who acts toward the child without violence under the authority of legal rights to custody or of guardianship. We can see no justification for creating the potential jeopardy to the efficient administration of the carefully devised foster-home placement program of the State which inheres in the contention that judicial hearings *must* be afforded "foster-parents", who have had a child for a substantial period of time, *before* the State may exercise its legal rights, as it deems appropriate, to remove the ward from the foster home to place it in another foster home or to make such other arrangements for the welfare of the child while the State is and remains the legal custodian, or guardian, of the infant. Should there be instances, rare in practice we feel confident but possible in conception, in which arbitrary administrative practices might endanger the welfare of any ward of the State, we believe that the existence of the court's equity jurisdiction, as carefully delineated in this opinion, and which protects children against abuse in the exercise of parental as well as custodial or guardianship authority, is a sufficient safeguard.

The entry must be:

Appeal denied.

MARDEN, J., sat at argument, but retired before the decision was rendered.

POMEROY, J., did not sit.

16. U. S. District Court (Conn.) Civil Docket No. 13127 (1969).