Moira Emerson HARMON

v.

Erlon L. EMERSON.

Supreme Judicial Court of Maine.

Argued Sept. 17, 1980.

Decided Feb. 13, 1981.

Grover G. Alexander, Gray (orally), for defendant.

Before WERNICK, GODFREY, NICHOLS, GLASSMAN, ROBERTS and CARTER, JJ., and DUFRESNE, A. R. J.

CARTER, Justice.

This appeal results from a divorce action commenced in March, 1974, in the District Court in Lewiston. The District Court awarded temporary custody of the parties' two minor children, Erlon Emerson III and Cameron Emerson, to the plaintiff-mother on April 18, 1974. Subsequently, a divorce was granted to the plaintiff on December 1, 1977. That decree left open for further hearing all remaining matters including custody and support of the children. After further hearing, the District Court, by decree dated January 16, 1979, awarded custody of both children to the plaintiff, with visitation rights in the defendant.[1]

The defendant-father appealed the award of custody to the Superior Court, which sustained his appeal and remanded the matter to the District Court with instructions to award custody to the defendant. Plaintiff appeals from this decision. We sustain the appeal and vacate the judgment of the Superior Court.

The District Court record consisted of testimony taken at a January, 1979, hearing, certain exhibits, and, by stipulation of the parties, the report of the Maine Department of Human Services dated October 25, 1977. The District Court did not make, and was not requested by either party to make, any findings of fact.

The record before the District Court reflects that the plaintiff and defendant were married in 1965. In 1971, after the birth of their two children, they moved to Durham, Maine, where they resided together with the children until they separated in March of 1974. At that time, the defendant moved to Massachusetts, and a divorce action was commenced. After an attempt at

Linnell, Choate & Webber, Robert E. Mullen (orally) and John R. Linnell, Auburn, for plaintiff.

1. The children remained in the custody of the plaintiff under the award of temporary custody throughout the nearly five years from the commencement of this action to the time of the entry of the District Court's determination of custody in January, 1979.

reconciliation, the parties separated finally in September of 1975. The children remained with the plaintiff in Durham. The defendant returned to Massachusetts where he has been employed since as a public accountant.

The children have done well in school and appear to have a close and happy relationship with the plaintiff. They have had little exposure, since the separation, to the defendant. Sometime in 1976, the plaintiff developed a relationship with her present husband, Stephen Harmon, who moved into the family household at Durham in 1976. They were married in November of 1978.[2] The children get along well with Mr. Harmon, and a supportive relationship exists among them. The departmental report indicates that both Erlon and Cameron stated that they liked him, and that he spends a lot of time with them. Mr. Harmon testified that he enjoys a "beautiful" relationship with the boys and that there were "no problems whatsoever" in that relationship. There is no evidence in the record indicating any difficulty between Mr. Harmon and either of the boys.

That relationship is in marked contrast to the relationship which exists between the children and the defendant. On at least one occasion, when the children visited with the defendant at his home in Massachusetts, strife developed which resulted in the boys, by their own choice, returning home sooner than expected. Defendant had otherwise seen these children on a few isolated occasions as of the time of the District Court hearing. Such meetings usually occurred when defendant was at the family home in Durham for other purposes and the children happened to be there.

Since the time of the separation, the plaintiff has received Aid to Families with Dependent Children (AFDC) benefits for the two children. The plaintiff applied for AFDC benefits because the defendant had failed to make support payments after November, 1977.

The appeal to the Superior Court was taken pursuant to the provisions of D.C.C.R. 73(a), which states in pertinent part that the appeal shall be "on questions of law only. . . . Any findings of fact of the District Court shall not be set aside unless clearly erroneous." The Superior Court, purporting to follow this Rule, noted in its opinion that "a finding of fact is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." This is the early formulation of the "clearly erroneous" test set forth in *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).[3]

In reversing the District Court judgment, the Superior Court stated:

> Although the District Court judge did not give reasons for awarding custody to the mother, the transcript of pertinent portions of the record suggests that he did not include in his consideration the threat to the physical and psychological security of the children which was posed by an unstable stepfather, and although he permitted questioning of Mr. Harmon's propensity for violence, he gave little weight to it.

The court further observed that: "The best interests of the minor children go beyond

---

**2.** The defendant has also remarried. The children have had little exposure to his present wife.

**3.** This formulation of the clearly erroneous test has been specifically approved by this court. *In re Longworth*, Me., 222 A.2d 561, 564 (1966). While this version of the rule is correct in a general sense, it gives little specific guidance as to the modalities of analysis which are to be employed in applying the rule to specific cases. It has been recognized as "vague" in nature. 1 R. Field, V. McKusick and L. Wroth, *Maine Civil Practice* § 52.7 (1970). The *Gypsum* formulation was not intended, however, to allow the appellate court to substitute its judgment in evaluating the weight of the evidence for that of the trial court. *United States v. Yellow Cab Co.*, 338 U.S. 338, 341-42, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949). Our court has articulated statements of the rule delineating the types of analysis required to apply the rule in concrete situations. *See* 1 R. Field, V. McKusick and L. Wroth, *supra.* § 52.7 nn. 21.15 and 22 (1977 Supp.).

the question of the mother's fitness whereby remarriage she injects a third party into the environmental picture, *whose instability threatens their physical and psychological security*" (emphasis added). The Superior Court considered nine factual aspects of the District Court record,[4] most relating to Mr. Harmon's past conduct, his personal attributes, and his potential to be an adverse influence on the children. The Superior Court made its *own* factual determinations on a record which provided conflicting factual data on each of these points. Concluding that, as a matter of fact, Mr. Harmon was "a dangerous daily exposure" for the children, the court noted that failure to take this into account was "an error of law" on the part of the District Court.

This record and the decision of the Superior Court raise serious and delicate issues as to the proper standard of review of child custody determinations in divorce cases on appeal from the District Court. First, we must determine the proper role to be given by the Superior Court Justice to the "clearly erroneous" test. Next to be considered is his application of the appropriate legal standard of review.

## I.

■ We hold that on the facts of this case the Superior Court committed error in its application of the "clear error" standard. Here, no findings of fact were made by the District Court on the custody issue. In such circumstances:

> [I]t must be assumed that he [the District Court Judge] found for the plaintiffs upon all issues of fact necessarily involved in his ultimate decision which was favorable to them.

*Jacobs v. Boomer,* Me., 267 A.2d 376, 379 (1970); *Small v. Small,* Me., 362 A.2d 178 (1976). Such "assumed" findings of fact may not be set aside unless clearly erroneous. *Boynton v. Adams,* Me., 331 A.2d 370, 374–75 (1975). Therefore, the Superior Court in the instant case was required to assume factual findings favoring the plaintiff. Then, only if the assumed findings were clearly erroneous could the Superior Court disregard factual findings in the resolution of the appeal before it. *See Bangor Spiritualist Church, Inc. v. Littlefield,* Me., 330 A.2d 793, 794 (1975); *Blue Rock Industries v. Raymond International, Inc.,* Me., 325 A.2d 66, 73 (1974).

■ As a matter of specific technique, any finding, whether express or assumed, is tested under the "clearly erroneous" standard by determining whether there is *any* competent evidence in the record to support it. *Moores v. Structural Concrete Corporation of Maine,* Me., 255 A.2d 892 (1969). If there is such evidence, the finding must stand.

> Under Rule 52(a) and its interpretation in the United States Gypsum Co. case, there must exist a stronger basis for overthrowing a finding of fact than a mere difference in personal judgment. Such evidentiary weight and such convictional certainty must be present that the appellate court does not feel able to escape the view that the trial court has failed to make a sound survey of or to accord the

4. These include principally: 1) Mr. Harmon's physical condition in January, 1975, as the result of a stroke; 2) concern that the stroke was caused by excessive drinking of alcoholic beverages; 3) that Mr. Harmon had, during the course of his relationship with Mrs. Emerson, while depressed, taken an overdose of valium pills, which was characterized as an "attempted suicide"; 4) concern that Mr. Harmon had a combative propensity which made him a threat to the children; 5) that Mr. Harmon's employment situation "appears tentative and erratic, leaving in serious question whether he and his new family would reside in one place for very long"; and 6) a conclusion that Mr. Harmon suffers from alcoholism. Additional factors

pointed to by the Superior Court, but not related directly to Mr. Harmon's presence in the family unit were: 7) the presence in the plaintiff's household of guns and knives; 8) the impact of the plaintiff's previous illness as the result of having contracted "Crohn's Disease"; and 9) concern because the investigating social worker had felt, some six months prior to the District Court hearing, that the plaintiff required psychological counselling.

The Superior Court noted generally that there was no evidence which "reflected unfavorably" on the defendant's fitness to raise the children, and noted that he and his second wife seemed situated to provide "a safe and comfortable home for them."

proper effect to all of the cogent facts, giving due regard, of course, to the trial court's appraisal of witness credibility where that factor is involved.

*Nee v. Linwood Securities Co.*, 174 F.2d 434, 437 (8th Cir. 1949).

■ In applying this standard in an appellate proceeding, the factual findings of the District Court are not to be altered or overturned by the Superior Court simply because an alternative finding *also* finds support in the evidence.

It is settled that where evidence would sustain a conclusion either way and the trial court decided it to weigh more heavily for the defendant, that such a choice *between two permissible views of the weight of the evidence* is not "clearly erroneous" within the meaning of Rule 52. (emphasis added).

*Hadco Products, Inc. v. Frank Dini Co.*, 401 F.2d 462, 464 (3d Cir. 1968). *See also United States v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).

■ The essential impact of the "clearly erroneous" rule is that the trial judge's findings stand unless they clearly cannot be correct because there is *no* competent evidence to support them. An appellate court can reverse a finding of fact only where (1) there is no competent evidence in the record to support it, or (2) it is based upon a clear misapprehension by the trial court of the meaning of the evidence, or (3) the force and effect of the evidence, taken as a total entity, rationally persuades to a certainty that the finding is so against the great preponderance of the believable evidence that it does not represent the truth and right of the case. *See Western Cottonoil Co. v. Hodges*, 218 F.2d 158 (5th Cir. 1955).

■ Applying the above analysis to the facts of the instant case, we find that the Superior Court erred when it determined that the District Court Judge "did not include in his consideration the threat to the physical and psychological security of the children which was posed by an unstable stepfather." The Superior Court was required to assume that the District Court Judge had found either that Mr. Harmon

was not an unstable stepfather or that any instability of Mr. Harmon which the District Court found from the evidence did not constitute a threat to the children's security. We find credible evidence in the record which supports such assumed findings of fact.

Likewise, the Superior Court erred by determining that the District Court Judge gave "little weight" to Mr. Harmon's "propensity for violence." The Superior Court was required to assume that the District Court had found either that Mr. Harmon had no improper propensity for violence, or that any such propensity, to the extent that it did exist, was not potentially damaging to the children. We find credible evidence in the record which supports such assumed findings.

With respect to the nine factual elements relied upon by the Superior Court in reversing the District Court's decree, there was, on each of those items, a genuine controversy created by conflicting factual evidence before the District Court. Assuming, as we must (and as the Superior Court Justice should have) that the District Court Judge made findings on each of those specific nine points, which were consistent with and supportive of his ultimate decision, we find credible evidence with respect to each of these points to justify such findings. Therefore, the decision of the District Court could not properly be overturned on the basis of the application of the "clearly erroneous" test to the District Court's assumed findings of fact.

Once it became clear that assumed findings of fact necessary to support the decision of the District Court could be justified by credible evidence in the record before the District Court, the Superior Court's factual review of that decision was at an end. The Superior Court's remaining task was to test the trial court's decision for "abuse of discretion".

## II.

The issue of child custody is among the most sensitive and vital questions that

courts decide. The court's decision may have a crucial and potentially long-term impact on the physical and psychological well-being and potential future development of the child at a time in its life when its future as a balanced, healthy and happy individual is most clearly at stake. The child's future as a valued and participating member of society may well rest on the outcome of the custody determination. Thus, both the individual child and society, as a whole, have a weighty interest in such decisions:

> One of the most important, if not the most difficult, problems to be decided by any court is the question of proper custody of minor children at the time of, or after, a divorce. The family "war" is fought by the father and mother, but too often the lifetime scars are carried by their children. Too frequently also, the principals in the divorce are more concerned in defeating the wishes of a former wife, husband, or "relative-in-law," than they are interested in the welfare of the child. The law looks, however, only to the child's welfare; and the father, mother, and other blood relatives, as such, have no rights in or to the child. A child is not "owned" by anyone. The state has, and for its own future well-being should have, the right and duty to award custody and control of children as it shall judge best for their welfare.

*Grover v. Grover*, 143 Me. 34, 36–37, 54 A.2d 637, 638 (1947).

The law of this state recognizes that in making custody determinations, the trial judge who "is asked to act as a 'wise, affectionate, and careful parent' to do 'what is best for the interest of the child' must be held to be invested with a broad discretion." *Roussel v. State*, Me., 274 A.2d 909, 926 (1971).

■ The applicable standard is whether or not the trial judge's decision on the custody issue was so erroneous as to constitute an abuse of discretion. *Costigan v.*

*Costigan*, Me., 418 A.2d 1144, 1147 (1980); *Cooley v. St. Andre's Child Placing Agency*, Me., 415 A.2d 1084, 1086 (1980); *Roussel v. State*, Me., 274 A.2d 909, 926 (1971). This appellate standard of review, as utilized for purposes of review of child custody determinations, is one formulated by this court in the exercise of its general equity jurisdiction. *Roussel v. State; Merchant v. Bussell*, 139 Me. 118, 27 A.2d 816 (1942).

Here, however, we review a determination of custody made incident to a divorce decree. The question therefore arises: in divorce proceedings may the court apply equitable principles?

■ It appears clearly from a long line of prior decisions that this court's jurisdiction over divorce cases derives from the statutory authority granted by the Legislature. *Wood v. Wood*, Me., 407 A.2d 282, 286 (1979). It is well established that the power of the court to act in matters of divorce or incident thereto is wholly dependent for its existence upon the statute conferring jurisdiction upon the court over divorce proceedings. *Baril v. Baril*, Me., 354 A.2d 392, 395 (1976); *Strater v. Strater*, 159 Me. 508, 510, 196 A.2d 94, 95 (1963); *Poulson v. Poulson*, 145 Me. 15, 20, 70 A.2d 868, 871 (1950). This court has recently observed that:

> Although courts construing the divorce statutes properly display a special solicitude toward the minor children of divorced parents in fashioning decrees in the best interests of the children, *the source of the courts' power* is the statute governing divorce *and not the general grant of equitable jurisdiction.* (emphasis added).

*Wood v. Wood*, 407 A.2d at 286.[5]

■ To say that the courts may not exercise their power in the field of domestic relations without a legislative mandate to do so does not necessarily limit the nature of the power which the court may undertake to exercise if that mandate is given. Once the Legislature has generally delegat-

5. For a lucid exposition of the historical basis for this conclusion, see *Wood v. Wood*, 407 A.2d at 285 n.3.

ed to the judiciary the performance of the dispute-resolution function in the area of domestic relations, it is the responsibility of the judiciary to determine how that function may best be carried out within the intent of the legislative mandate.

19 M.R.S.A. § 752 provides in part that: The court making an order of nullity or of divorce may make an order concerning the care, custody and support of the minor children of the parties. . . .

Thus, it is clear that the Legislature intended for the courts to have the *power* in divorce actions to determine issues of custody.

Because of the involvement of public policy in divorce actions, they are distinguishable from other forms of litigation. The State is a party to every divorce action . . . . Public policy should be and is one of the prime considerations in considering all procedures relating to divorce. . . .

*Deblois v. Deblois*, 158 Me. 24, 30, 177 A.2d 199, 202 (1962).

Public policy requires that within divorce proceedings the State be able to implement its role of *parens patriae*, thereby "promoting the best interests and welfare of minor children. . . ." *Pendexter v. Pendexter*, Me., 363 A.2d 743, 748 (1976) (Dufresne, C. J., concurring). We find that the Legislature intended for courts in determining issues of custody in divorce proceedings to apply the equitably-based principles which are applied to custody determinations made under the full equitable jurisdiction, (deriving from the English Court of Chancery) which was originally granted by the Legislature to the Supreme Judicial Court in 1874.[6]

We recently delineated in some detail the considerations to be taken into account by the trial court in custody proceedings:

In determining which parent or, as appropriate, what third party, will provide for a child's best interests, the court should consider all factors having reasonable bearing on the physical and psychological well-being of the child. *Osier v. Osier*, Me., [410 A.2d 1027 (1980).] We mention as the general pertinent considerations, among many others that can become involved in particular circumstances: the age of the child, the relationship of the child with his parents and any other persons who may significantly affect the child's best interests, the wishes of the parents as to the child's custody, the preference of the child (if old enough to express a meaningful preference), the duration and adequacy of the current custodial arrangement and the desirability of maintaining continuity, the stability of the proposed custodial arrangement, the motivation of the competing parties and their capacity to give the child love, affection and guidance, and the child's adjustment to his present home, school and community.

*Costigan v. Costigan*, Me., 418 A.2d 1144, 1146 (1980). On review, the "delicate balancing" of these factors

is left to the sound discretion of that judge who has the singular opportunity to observe the individuals involved and therefore is in the best position to act *on behalf of the State* as a wise, affectionate and careful parent. (emphasis added).

---

**6.** By P.L. 1874, Ch. 175, the Legislature granted to the Supreme Judicial Court "full equity jurisdiction, according to the usage and practice of courts of equity, in all . . . cases where there is not a plain, adequate and complete remedy at law." That general grant of jurisdiction is also conferred upon the Superior Court by 14 M.R.S.A. § 6051(13). *See Opinion of the Justices*, 147 Me. 25, 30, 83 A.2d 213 (1951). The District Court is given original jurisdiction concurrent with that of the Superior Court " . . . of actions for divorce, annulment of marriage or judicial separation *and of proceedings under Title 19.* . . ." (emphasis added.) 4 M.R.S.A.

§ 152. By the provisions of 19 M.R.S.A. § 752, either Court making an order of nullity or of divorce is empowered to also make an order " . . . concerning the care, custody and support of the minor children of the parties. . . ." Thus, the general equity powers of the Superior Court under 14 M.R.S.A. § 6051(13) flow to the District Court by force of the "concurrent jurisdiction" provision of § 152. Because of the impact of § 752, either Court in making a custody determination under these statutory grants of jurisdiction has the "full equity jurisdiction" conferred upon the Superior Court.

*Id.* at 1147. Thus, it is only for abuse of the exercise of such equitably-based discretion that the trial judge's *ultimate* decision is to be overturned.

We think the record in this case clearly reflects a proper application by the District Court of the general equitable standards and of the considerations set forth in *Costigan* in deciding that custody should be awarded to the plaintiff. The record supports the District Court's conclusion that the social interests and psychological well-being of these children would not be advanced by wrenching them out of a custodial arrangement, which has existed for the last five years, without very good reason. That arrangement is based upon a secure and meaningful relationship with their mother. The Superior Court action would have substituted a new relationship with their father, who for some years has had almost no contact with them. In the exercise of a wise and affectionate discretion, the District Court judge would need to find compelling reasons adversely affecting the well-being of these children to justify destroying the stable patterns of their existing life style to substitute in place thereof an already failed relationship or, at best, one of unproven success.

The principal factor upon which the Superior Court relied in changing the custody of these children was its view of Mr. Harmon's role in the family unit. We think that the District Court did not commit any abuse of discretion in assessing Mr. Harmon's place in the total life setting of this family and these children. As discussed above, the Superior Court based its determination upon its own view of the facts. See note 4 *supra.* If the Superior Court had properly applied the clearly erroneous test, it could not have found the District Court clearly in error in determining that Mr. Harmon had overcome whatever drinking problem he may have had; that the single incident in which Harmon escorted an offensive person from his household did not indicate a "combative propensity"; that the incident allegedly constituting an "attempted suicide" occurred during a period of extreme stress when Harmon was concerned about the health of the plaintiff, who was then hospitalized, and about her uncertainty over whether to marry him, and that a similar incident was unlikely to occur; that the only guns in the plaintiff's home are hunting rifles; that while the boys are allowed to carry pocket knives, they know the rules of safety; that while the plaintiff's medical condition is potentially serious, it is manageable with appropriate treatment which the plaintiff is receiving; and that the social worker's recommendation that the plaintiff receive psychological counselling was made in the context of her indecision over whether to marry Harmon (which she since has done). Moreover, there is evidence justifying the findings that the boys have a warm, close relationship with both the petitioner and Harmon, and that they would prefer to remain with them rather than live with the defendant.

Certainly on these facts, and on all the evidence, it is unquestionably clear that the District Court judge acted properly as a "wise, affectionate and careful parent" and that he did not in any respect abuse his discretion. As we have recently stated:

> As long as there is rational support for the decision, we will not overturn it. This does not mean we will affirm every child custody order .... Such decisions should only be made when the presiding justice, acting as a "wise, affectionate, and careful parent," ... concludes after a thorough and careful review of the evidence before him that it is the best possible arrangement for the child. (Citations omitted).

*Sheldon v. Sheldon,* Me., 423 A.2d 943, 946 (1980). Our review of this record convinces us that the District Court judge correctly applied the appropriate equitable standards and did not in any respect abuse his discretion in doing so. The Superior Court should have so found on appeal.

The entry will be:

Judgment of the Superior Court vacated; remanded to Superior Court to affirm the judgment of the District Court.

All concurring.