**DEPARTMENT OF HUMAN SERVICES**

v.

**Ronald HULIT.**

Supreme Judicial Court of Maine.

Argued March 11, 1987.
Decided April 28, 1987.

James E. Tierney, Atty. Gen., Brian T. McNally (orally), Dept. of Human Services, Portland, for plaintiff.

Stanley Greenberg (orally), Greenberg & Greenberg, Portland, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, SCOLNIK and CLIFFORD, JJ.

SCOLNIK, Justice.

The defendant, Ronald Hulit (Hulit), appeals from a judgment of the Superior Court (Cumberland County) affirming a District Court judgment determining him to be the natural, biological father of a child (T.), who is the son of his ex-wife, Doris Gough (Gough), and ordering him to pay for T.'s support and care.[1] The plain-

---

1. In this appeal, we directly review the judg-       ment of the District Court and the record as it

tiff, Department of Human Services (DHS), brought this action on behalf of Gough. Hulit challenges the District Court's finding of paternity based on a certain blood test, and contends that he was denied due process of law because the court used a "preponderance of the evidence" standard of proof rather than a "clearly erroneous" standard in determining paternity. He also challenges the court's award of attorney's fees to DHS, and the reimbursement of AFDC monies spent by DHS to support T.

## I.

After being married for six years and having one child, Doris Gough and Ronald Hulit were divorced in March, 1976. The following fall, however, they dated and, on one occasion, had sexual intercourse. After that, they did not see each other until April 3, 1977, at which time they engaged in sexual intercourse without contraception. The parties did not see each other after the April 3 encounter until six weeks later, at which time Gough told Hulit that she was 5 to 6 weeks pregnant. She gave birth to a baby boy on January 3, 1978.

The District Court found as a fact that blood tests conducted by the Foundation for Blood Research and introduced at trial demonstrated that "it is likely that Mr. Hulit is the father of [T.]." The court also found that DHS had spent $5,561 in support of T. and that Hulit had the ability to provide $38.00 per week for T.'s support.

The District Court held that (1) Hulit was the natural and legal father of T.; (2) Hulit had a duty to support T. and the ability to pay $38.00 weekly for that support; (3) Hulit was obliged to reimburse $5,561 to DHS for AFDC moneys disbursed by the latter in support of T.; (4) DHS was entitled to attorney's fees from Hulit in the amount of $1,300 and (5) DHS was entitled to $1,570 for blood tests and expert witness fees. Hulit challenges each of these conclusions.

## II.

Hulit argues that the District Court erred in finding that he was the father of T. based upon certain blood tests and expert interpretations of those tests. We will reverse that finding only if "(1) there is no competent evidence in the record to support it, or (2) it is based upon a clear misapprehension by the trial court of the meaning of the evidence, or (3) the force and effect of the evidence, taken as a total entity, rationally persuades to a certainty that the finding is so against the great preponderance of the believable evidence that it does not represent the truth and right of the case." *Harmon v. Emerson*, 425 A.2d 978, 982 (Me.1981).

> The District Court found as follows:
> In September, 1983, the Foundation for Blood Research performed certain tests upon blood samples from the Defendant, Doris J. Gough, and [T.]. The results of the HLA and red blood cell determinations for those individuals indicate a 93.69% probability that the Defendant is the father of [T.]. According to Hummel's verbal predicates,[2] this percentage demonstrates that it is likely that Mr. Hulit is the father of [T.].

Hulit contends that this finding is clearly erroneous because the District Court failed to base its conclusion on other, "more complete and powerful" blood tests admitted at trial and expert testimony interpreting them.

We are unable to conclude, however, that the District Court's finding is clearly erroneous simply because other evidence presented may have supported a different finding. *See Blackmer v. Williams*, 437 A.2d 858, 862 (Me.1981). The District Court's resolution of potentially conflicting evidence to reach a factual finding is entitled to deference by this Court because the District Court, as a trial court, is in a better position than we are to weigh the evidence and judge the credibility of witnesses whose testimony may differ. *See*

was developed before that court. *State v. Michael Z.*, 427 A.2d 476, 477 (Me.1981).

**2.** Hummel is a statistician, who has given "verbal predicates," for example "likely" or "unlikely," to these percentages.

*id.* at 863; *Qualey v. Fulton,* 422 A.2d 773, 775–76 (Me.1981).

Evidence admitted at trial adequately supports the finding of the District Court. The finding is, therefore, not clearly erroneous.

### III.

■ Hulit also contends that the District Court's conclusion that he is the natural and biological father of T. must be set aside because it was based on a "preponderance of the evidence" standard of proof. He contends that the court was required to employ a "clear and convincing evidence" standard.

Hulit concedes that he did not preserve this issue for appellate review. He suggests, however, that we should address the issue because he alleges that the District Court violated his constitutional rights of due process under the Maine and United States constitutions by applying the preponderance of the evidence standard. Although the record fails to disclose the standard of proof that was in fact applied by the court, Hulit contends that the preponderance of the evidence standard must have been applied because "this standard is the one which ordinarily applies in civil cases, and no appellate court has yet directed the District Court to use a higher standard."

We have repeatedly stated that, absent exceptional circumstances not present in this case, issues not raised before trial courts, even if constitutional, will not be heard on appeal. *Cyr v. Cyr,* 432 A.2d 793, 797–98 (Me.1981); *Salamone v. City of Portland,* 398 A.2d 49 (Me.1979); *Teel v. Colson,* 396 A.2d 529 (Me.1979). *See also State v. Thornton,* 485 A.2d 952, 953 (Me.

1984); *State v. Desjardins,* 401 A.2d 165, 169 (Me.1979). One of the primary purposes of this rule is to "ensure that the trial court has an opportunity to determine the propriety of the relief requested." *Cyr v. Cyr,* 432 A.2d at 798. Another reason for the rule is to ensure that an adequate record is developed for a careful and accurate analysis of the issue on appeal. We see no reason to depart from these principles in the case at bar. As a result, we will not set aside the court's conclusion that Ronald Hulit is the father of T.

### IV.

■ Hulit next argues that the District Court abused its discretion in ordering him to pay $38.00 per week for the support of T. pursuant to sections 271 of Maine's Uniform Act on Paternity and section 442 of Maine's Uniform Civil Liability for Support Act.[3] He argues that the District Court was required to consider the earning capacity of Gough and to consider carefully the relative abilities of both parents to support the child before determining the amount of child support the father must pay. Since the District Court failed explicitly to make those determinations in its findings of fact and conclusions of law, he contends that its support order must be vacated. We disagree.

Although it is incumbent upon courts, in determining the proper amount of child support in any particular case, to consider the factors outlined by Hulit, *see Shirley v. Shirley,* 482 A.2d 845, 848–49 (Me.1984), we cannot conclude on the record before us that those factors were overlooked by the court in this case. Because we find credible evidence in the record upon which to

---

**3.** Title 19, M.R.S.A., section 271 provides:

§ 271. Obligations of the father

The father of a child which is or may be born out of wedlock is liable to the same extent as the father of a child born in wedlock, whether or not the child is born alive, for the reasonable expense of the mother's pregnancy and confinement and for the education, necessary support and funeral expenses of the child, and reasonable counsel fees for the prosecution of paternity proceedings.

19 M.R.S.A. § 271 (1981).

Section 442 provides:

§ 442. Man's duty of support

Every man shall support his wife and his child.

19 M.R.S.A. § 442 (Supp.1986).

Section 443, however, provides in addition:

§ 443. Woman's duty of support

Every woman shall support her child; and her husband when in need.

19 M.R.S.A. § 443 (Supp.1986).

base the award of child support, we will not overturn that ruling. *See id.*

## V.

■ Hulit challenges the District Court's order that he reimburse DHS for AFDC monies paid to Gough for the support of T. He contends that the court erred by receiving in evidence, over his attorney's objection, a document containing a summary of those payments. Since that was the only evidence presented at trial concerning the amount of AFDC monies paid by DHS for the support of T., he argues that because it is inadmissible, there is no basis for the court's order. We disagree with his argument that the evidence was inadmissible.

The disputed document was a completed form entitled "Official Record of Public Assistance Paid and Support Contributions Received by the Department of Human Services." It stated that between January 3, 1978 and January 22, 1982, Doris Gough received $5,561 on behalf of T. The document was signed under oath on February 14, 1984 by the legal custodian of financial records for DHS. Attached to the document was a certificate, signed by the Commissioner of DHS, stating that the person who signed the form was, at the time of the signing, the "custodian of the Assistance Payment Records." No question is raised as to the adequacy of the disputed document to prove an official data compilation under M.R.Evid. 1005.

At trial, Hulit's counsel objected to the admission of this document on the ground that it was hearsay and not within the Public Records exception to the hearsay rule, M.R.Evid. 803(8).[4] Hulit repeats the same argument on appeal.

He contends that the document should have been excluded because DHS presented no foundational evidence that this information was regularly recorded or kept "pursuant to duty imposed by law," *see* M.R.Evid. 803(8)(A), and, in any event, it is expressly excluded under Rule 803(8)(B) of the Maine Rules of Evidence because it was an investigative report prepared by DHS as an answer to an interrogatory propounded by Hulit in preparation for trial and offered "by it in a case in which it is a party." *See* M.R.Evid. 803(8)(B)(ii). He also argues that it should be excluded because it is "factual findings resulting from [a] special investigation of a particular complaint, case, or incident" and that it is surrounded by circumstances indicating that it lacks trustworthiness. *See* M.R. Evid. 803(8)(B)(iv), 803(8)(B)(v). We disagree.

The document was a data compilation of a public agency setting forth its regularly conducted and recorded activity. It is explicitly admissible pursuant to M.R.Evid. 803(8)(A) regardless of whether or not the agency was required under law to keep such records. *See* M.R.Evid. 803(8)(A). It is not excluded by 803(8)(B) because it is not an "investigative report" or "factual findings resulting from special investigation of a particular complaint, case, or incident." Instead, it is simply a compilation of regularly recorded data. The document was not the result of an investigation involving subjective interpretations by public officials that could taint its trustworthi-

---

**4.** Rule 803 of the Maine Rules of Evidence provides, in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(8) Public Records and Reports.

(A) To the extent not otherwise provided in (B), records, reports, statements, or data compilations in any form of a public office or agency setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law.

(B) The following are not within this exception to the hearsay rule:

(i) investigative reports by police and other law enforcement personnel; (ii) investigative reports prepared by or for a government, a public office or an agency when offered by it in a case in which it is a party; (iii) factual findings offered by the state in criminal cases; (iv) factual findings resulting from special investigation of a particular complaint, case, or incident; (v) any matter as to which the sources of information or other circumstances indicate lack of trustworthiness.

ness. It was a portion of regularly kept data that is inherently trustworthy and, therefore, admissible pursuant to Rule 803(8)(A) of the Maine Rules of Evidence.

## VI.

█ Finally, Hulit challenges the District Court's award of certain costs and attorney's fees to DHS for its prosecution of this action.

He argues that the court abused its discretion in awarding attorney's fees to DHS because the award was not sufficiently supported by evidence in the record before the court. We agree.

The District Court's Judgment and Order of March 25, 1985 contains an Attachment "A," which is an "Itemized Accounting of Attorneys Fees." It lists the different work performed by DHS's counsel and his hourly rate. It is not accompanied by affidavits from DHS or from its attorney attesting to the nature of the fee arrangement between them.

In *Brandis v. Brandis,* 489 A.2d 1110, 1112 (Me.1985); we said:

> It should be clear to the Bar by this time that an award of attorney's fees will not survive a challenge in the absence of at least an affidavit attesting to the defendant's fee arrangement with her lawyer, counsel's customary hourly rate, and other such facts necessary to allow the court to make a valid calculation as to what amounts to reasonable counsel fees. *Hebert v. Hebert,* 475 A.2d 422, 426 (Me.1984).

We apply those principles here and hold that DHS has failed accurately to establish the basis for its award of attorney's fees. Accordingly, we vacate the award of attorneys fees and remand the case to the District Court for a proper determination of those fees according to the criteria set forth in *Brandis.*

Hulit also objects to part of the District Court's judgment that orders him to pay $1,570.00 to DHS for blood test and expert witness fees. DHS has abandoned any claim for those fees. As a result, we vacate the portion of the judgment ordering Hulit to pay those fees.

The entry is:

Award of attorneys' fees and costs for expert witnesses and blood tests vacated. Remanded to the Superior Court with instructions to remand to District Court for further proceedings consistent with the opinion herein.

In all other respects, judgment affirmed.

All concurring.