2000 ME 140

**DEPARTMENT OF HUMAN SERVICES o/b/o Karen M. HAMPSON**

v.

**John E. HAGER.**

Supreme Judicial Court of Maine.

Submitted on briefs March 29, 2000.

Decided July 20, 2000.

Andrew Ketterer, A.G., Michael G. Keefe, AAG, Augusta, for DHS.

John Hager, pro se, Wilton Manors, FL, for the Defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] John E. Hager appeals from a judgment entered in the Superior Court (Aroostook County, *Pierson, J.*) affirming a judgment of the District Court (Presque Isle, *Griffiths, J.*) which determined that Hager owed the Department of Human Services certain amounts it had paid to support Hager's son and to establish Hager's paternity. The District Court judgment was entered upon remand from a prior appeal to the Superior Court (*Pierson, J.*) of the initial District Court (Fort Kent, *Gaulin, J.*) judgment that first established Hager's liability to the Department. Hager contends that the District Court erred (1) by improperly applying the child support guidelines to determine Hager's debt to the Department; (2) in calculating the medical expenses that the Department had paid on behalf of Hager's son; and (3) in including the cost of paternity testing in his debt to the Department. Except for the determination of the cost of paternity testing, which part of the judgment we affirm, we vacate the judgment and remand for a determination of Hager's debt to the Department for its past financial and medical support of Hager's son.

[¶ 2] John Hager and Karen Hampson were involved in a relationship from 1985 to 1992. Hampson gave birth to a son on July 19, 1986. In 1993, when Hager did not acknowledge paternity of the child, the Department filed a paternity action in the District Court seeking to establish paternity and to recover amounts it had paid in public assistance to Hampson to support the child. *See* 19 M.R.S.A. § 521 (Supp. 1993), *repealed by* P.L.1995, ch. 694, § B–1 (effective Oct. 1, 1997).[1] The court granted the Department's motion for court ordered blood tests and allowed the Department to obtain reimbursement for the cost of the testing. The court held a hearing to determine paternity, and if paternity were established, to determine the amount Hager was to reimburse the Department for services it had provided to Hager's son.

---

1. This case involves the application of various provisions of Title 19 as they existed in April 1993 when this action was commenced. Title 19 was repealed in its entirety by P.L.1995, ch. 694, § B–1 (effective Oct. 1, 1997).

[¶ 3] The hearing was held in the District Court (Fort Kent, *Gaulin, J.*) on April 6, 1994. The Department introduced the results of the blood tests establishing that the probability of paternity was 99.66%. The Department also introduced two documents under the seal of the State of Maine (blue seal documents) that demonstrated that the State had paid $3836.87 in Medicaid benefits and $11,493.50 in AFDC benefits for the child between May of 1987 and August of 1993.

[¶ 4] Hampson testified that she lived in Maine and received benefits from the State from February of 1987 to June of 1987 and then again from July of 1989 to October of 1993. She stated that during her time in Maine, she did not receive any support from Hager.

[¶ 5] Hager offered signed statements of witnesses asserting that Hager lived with Hampson and his son between 1989 and 1992 and that Hager and Hampson had a joint charge account at a local market where they charged between $200–$300 each month. The evidence was excluded by the court as hearsay, and the court refused Hager's request to continue the case so he could bring those witnesses to court.

[¶ 6] Hager asked Hampson several questions on cross-examination in an attempt to establish that he had provided support for his son. Hampson conceded that Hager had lived with her "[o]ff and on. On the weekends, or off and on." The trial court interrupted the cross-examination, however, and the following exchange occurred:

> Court: [T]he issue in this case is how much has the State paid to her on behalf of these children and whether or not you're the father.... I can't offset how much you claim that you gave her from the claim of the Department of Human Services. If you want to do that in a separate action

with them, you're certainly entitled to do so.

> Mr. Hager: Okay.

> Court: But there's nothing in the statute which indicates that I can in any way offset any payments made by you during a time when you were either supporting her, or helping her with the kids, or giving some kind of money.

[¶ 7] Hager testified that while he was in Maine, he lived exclusively with Hampson and his son until October of 1992. He also stated that he currently had no money, was not capable of working, and was in the process of applying for social security disability as a result of an injury he sustained while in the military.

[¶ 8] Hager did call one witness at the hearing, Hampson's cousin, to refute Hampson's testimony that Hager did not live with her and did not support her. The cousin testified that Hager and Hampson lived together at the witness's house when they moved to Maine in 1989. She also testified that after they moved, as far as she knew, Hager stayed with Hampson whenever he was not working an overnight shift at his job. The court interrupted the witness's testimony, however, concluding that it was irrelevant.

[¶ 9] Although Hager argued at the hearing that evidence of past support was relevant, he never stated the legal grounds that would support its admission. The court found that Hager was the father of the child and determined that Hager owed the Department $15,630.37.[2] The court also found that Hager had no ability to pay child support.

[¶ 10] Hager appealed to the Superior Court arguing that the trial court erred in not modifying the amount paid by the Department on behalf of his son to reflect the support Hager had provided between 1987

---

2. Of the $15,630.37, $11,493.50 was for AFDC expenditures, $3836.87 for medical expenditures and $300 for blood tests.

and 1993. Hager also contended that the trial court erred in admitting the blue seal documents because the court had told Hager, off the record, that Hager could not object to the admission of those documents.

[¶ 11] Hager argued in his reply brief to the Superior Court that any computation for past support must be made according to the child support guidelines. Hager also argued that 19 M.R.S.A. § 495 (1981 & Supp.1993) required the trial court to calculate Hager's past support debt based on Hager's actual income during those years.

[¶ 12] The Superior Court held that the blue seal documents were properly admitted. The court also concluded that Hager could not reduce his obligation to DHS by showing the amount of funds he expended in support of the child. The court did agree with Hager that 19 M.R.S.A. § 495 (1981 & Supp.1993) required the trial court to consider Hager's actual income in calculating his debt for past support, and it remanded the case to the District Court:

> On rehearing, the parties may present evidence to the court relevant to the calculation under section 495.... This case is remanded to the District Court for a hearing solely on the question of Hager's income for the period in which DHS was entitled to support payments. Based on the evidence presented to the District Court and its calculation under 19 M.R.S.A. § 495, it will enter an Order establishing the amount that Hager owes DHS.

[¶ 13] On remand, Hager moved the court to admit evidence of his past support of his son. He also asserted that section 495 contemplated not simply a mathematical calculation of his income but rather a calculation of his gross income as that term was defined by the child support guidelines.[3] The court (*Griffiths, J.*) denied the motion to allow evidence, ruling

that Hager would only be permitted to submit evidence of his "income for the period in which DHS was entitled to support payments."

[¶ 14] Notwithstanding its prior ruling, the court did accept some evidence regarding support Hager claimed he provided for his son. Hager testified that he lived with Hampson and his son from 1989 to 1992 and that he paid all of the bills, including those for cable, phone, and electric, as well as an average grocery bill of $300 per month. Hager also testified that his daughter from a previous relationship lived with him for several months in each of the years 1989–92.

[¶ 15] Witnesses for Hager testified that soon after arriving in Maine in 1989, Hager, Hampson, and their son, rented a home for several months, and that Hager paid the rent. They lived together between 1989 and 1992, and Hampson made charges on Hager's account at the local grocery store, an account which Hager paid. During that time, Hager provided to his son not just food and clothing but also birthday and Christmas presents.

[¶ 16] The District Court's decision and judgment included findings regarding Hager's income between 1987 and 1992. The court used those findings and the child support table to determine Hager's debt to the Department to be $11,298.07, including $7161.20 for AFDC payments, $3836.87 for medical expenses, and $300 for paternity testing.

[¶ 17] Hager appealed again to the Superior Court, which affirmed. The court, relying on principles of res judicata, refused to consider Hager's arguments that his support obligation should have been modified to reflect past support he had paid on behalf of his son. Hager's appeal to this Court followed.

---

3. Among other things, Hager offered to provide documentary and testimonial evidence regarding the amounts he paid for rent, food, clothing, utilities, daycare/babysitting, and transportation.

■ [¶ 18] When the Superior Court acts as an intermediate appellate court, we review the judgment of the District Court directly. *See Sorey v. Sorey*, 1998 ME 217, ¶ 7, 718 A.2d 568, 569.

[¶ 19] Both parties dispute whether the District Court correctly applied the child support guidelines in determining Hager's debt due the Department for past support. Neither District Court decision, however, ever fully applied the guidelines to the facts of this case, although in its second decision, the District Court did use the child support table for a limited purpose.

I.

■ [¶ 20] We must determine whether section 495 requires the District Court to calculate the debt for past support according to the child support guidelines, specifically 19 M.R.S.A. §§ 311, 316, 317 (Supp. 1993), as they existed in April 1993.[4]

■ [¶ 21] Statutory interpretation is a question of law that we review de novo. *See Thibeault v. Larson*, 666 A.2d 112, 114 (Me.1995).

When interpreting a statute we first look at the plain meaning of the statutory language seeking to give effect to the legislative intent. The statutory language should be construed to avoid absurd, illogical, or inconsistent results. We also consider the whole statutory scheme for which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved.

*Estate of Whittier*, 681 A.2d 1, 2 (Me.1996) (citations omitted).

[¶ 22] In April of 1993, the calculation of debts to the Department for past child support was governed by 19 M.R.S.A. § 495(1)(A), which provided in part:

**1. Public assistance.** Debts due the department for public assistance are as follows.

A. When no court order of support has been established, a payment of public assistance for the benefit of the dependent child creates a debt due the department from the responsible parent. The amount of debt due the department is established by application of the most current child support

4. We will not review an issue that has not been properly preserved. *See Farley v. Town of Washburn*, 1997 ME 218, ¶ 5, 704 A.2d 347, 349. "Issues must be raised at the trial court level to ensure that the focus of legal issues be narrowed through fact finding and to insure that all factual disputes be resolved prior to appeal." *Id.* We consider an issue "raised and preserved if there is sufficient basis in the record to alert the court and any opposing party to the existence of that issue." *Id.; see also Chasse v. Mazerolle*, 580 A.2d 155, 156 (Me.1990).

In the initial proceeding held in the District Court, Hager argued that his debt to the Department should be modified to reflect past support that he had actually paid on behalf of the child. Although he did not argue that the mechanism for achieving that reduction was to be found in the child support guidelines, Hager did raise that issue in his reply brief to the Superior Court, arguing that all support computations must be made according to the guidelines. He persisted in that position after the case was remanded to the District Court, filing a motion in which he argued that he was entitled to modify his income to reflect past support paid for his son, *see* 19 M.R.S.A. § 311(5)(E) (Supp.1993), and to reflect amounts he spent supporting his daughter when she lived with him, *see* 19 M.R.S.A. § 316(4)(A) (Supp.1993). Hager also argued that he was entitled to a deviation from the guidelines because he was providing primary residential care more than 30% of the time, *see* 19 M.R.S.A. § 317(3)(A) (Supp.1993), though he did not provide the court with the proposed written findings required by the statute, *see* 19 M.R.S.A. § 317(2) (Supp.1993). Though Hager did argue that he was the primary caregiver, he did not argue that he was entitled to the presumption contained in 19 M.R.S.A. § 316(3) (Supp.1993) ("The primary residential care provider is presumed to spend the primary care provider's share [of parental support] directly on the child or children.") until he appealed the second District Court decision. Nevertheless, because Hager's actions were sufficient to alert the court and the opposing party to the existence and nature of the issue of Hager's past support of the child, we conclude that he has adequately preserved it for review.

scale to the responsible parent's income for the time period in which the department was entitled to support payments. *See* 19 M.R.S.A. § 495(1)(A) (Supp.1993).[5]

[¶ 23] The Department argues that section 495 requires a court to make a factual finding as to the parent's *actual income* and plug that income figure into the "child support table" to calculate the past support amount. Hager argues that section 495 requires a court to calculate past support by applying the child support guidelines in full.

[¶ 24] Section 495 explicitly directs a court to apply "the most current child support scale" to the parent's income to determine the amount of the debt. *See* 19 M.R.S.A. § 495(1)(A) (Supp.1993). Neither section 495 nor any other statute, however, defines what is meant by "child support scale." That confusion can be resolved, however, by looking to the purpose of the section and the purpose of the child support guidelines.

[¶ 25] When section 495 was amended in 1992, the Legislature changed the calculation of the debt due the Department, no longer requiring the parent to reimburse the Department for the full amount of the public assistance it had paid out. *See* P.L. 1991, ch. 673, § 7 (effective Mar. 17, 1992).[6] The Legislature indicated the reasons for the amendment in the preamble of the Act, noting that under the then current law, "a responsible parent's past debt due the Department of Human Services for public assistance paid is the amount of public assistance paid, *even if the responsible parent's past earning capacity could not provide that level of support.*" *See* P.L. 1991, ch. 673, preamble (effective Mar. 17, 1992) (emphasis added). The purpose of

the amendment was to change the calculation of past debts to reflect the parent's ability to pay in the prior years.

[¶ 26] That purpose is consistent with the purpose behind the child support guidelines. *See* 19 M.R.S.A. § 316(1) (Supp.1993) (making the support obligation dependent on the annual gross income of the parents); *see also* 19 M.R.S.A. §§ 316(3), (4)(A), 4(C) (Supp.1993) (stating that a parent who is the primary care provider is presumed to be satisfying his or her share of child support, allowing a nonprimary care provider to adjust his or her income downward to reflect money paid by that parent to support other children in that person's household, and prohibiting child support awards that require a nonprimary care provider whose gross income is below the poverty line to pay more than 10% of his or her weekly income in child support); 19 M.R.S.A. § 317(Q) (Supp.1993) (allowing for deviation from child support guidelines in certain cases where the award would be "inequitable or unjust").

[¶ 27] Moreover, the statutory scheme would reflect substantial inconsistencies if it were to be determined that one rule applied to calculations for past support and a different rule applied to calculations for current and future support. That inconsistency would be plainly unfair to parents such as Hager. For example, under the guidelines, a parent who is fulfilling his or her obligation to provide support is not charged with a further duty of support. See 19 M.R.S.A. § 316(3) (Supp.1993). Section 495, if not linked to the guidelines, makes no provision for deducting from the past debt any amount already paid by the parent to support the child. Thus, in cases

---

**5.** That calculation is currently governed by 19–A M.R.S.A. 2301(1)(A) (1998) which contains almost identical language.

**6.** Prior to March 17, 1992, 19 M.R.S.A. § 495(1)(A) provided:

    A. When no court order of support has been established, a payment of public assis-

tance for the benefit of the dependent child creates a debt due the department from the responsible parent *in the amount of public assistance paid.*

19 M.R.S.A. § 495(1)(A) (Supp.1991), *repealed by* P.L.1991, ch. 673, § 7 (effective Mar. 17, 1992) (emphasis added).

such as this, where a parent claims that he or she was providing support while the other parent, unbeknownst to the first, was receiving benefits, possibly as a result of fraud, the parent who actually provided support would be required to pay twice. The Legislature could not have intended such a result.[7]

[¶ 28] The only way to construe section 495 in the context of the statutory scheme for calculating and enforcing child support obligations is to apply the guidelines to the calculation of debts for past support.

## II.

[¶ 29] Hager argues that the trial court erred in calculating the amount of medical assistance the State paid on behalf of his son. He contends that the court erred in relying on the blue seal document to establish the amount because that document included expenses that were incurred more than six years prior to the date the Department commenced this suit, rendering them uncollectible. *See* 19 M.R.S.A. § 519 (Supp.1993) ("An alleged father's liability for past expenses incurred is limited to the 6 years preceding service of the notice.")

[¶ 30] The court's finding that the Department paid $3836.87 in medical expenses is a finding of fact that we review for clear error. *See White v. Zela*, 1997 ME 8, ¶ 3, 687 A.2d 645, 646. "A trial court's factual determinations are 'clearly erroneous' only if there is no credible evidence on the record to support them." *Id.*

[¶ 31] Hager argues that the blue seal document includes expenses that were paid for John's birth, which occurred in 1986, more than six years prior to the commencement of this suit. The document, however, asserts that the State paid those benefits between May 1, 1987 and August of 1993. Moreover, Hager offered no evidence that any of those payments were made for expenses incurred prior to

May of 1987. Accordingly, the trial court's conclusion that the blue seal document accurately represented the amount the State had paid for medical expenses incurred between May 1, 1987 and August of 1993 is not clearly erroneous. *See Department of Human Servs. v. Hulit*, 524 A.2d 1212, 1215 (Me.1987) (holding that a blue seal document was admissible and sufficient to prove assistance paid).

[¶ 32] The determination of the amount paid by the Department in medical assistance, however, does not establish the amount Hager owes the Department for that past medical support. Rather, the section 495 calculation described above will determine Hager's total debt to the Department for past AFDC support *and* past medical support.

[¶ 33] Section 495 governs the calculation of "[d]ebts due the department for public assistance." *See* 19 M.R.S.A. § 495 (1981 & Supp.1993). Section 493 defines public assistance as "money payments *and medical care* furnished to or on behalf of dependent children by the State." *See* 19 M.R.S.A. § 493 (Supp.1993) (emphasis added). Accordingly, as with the determination of the debt owed by Hager for financial assistance provided by the Department, any debt owed for medical assistance must also be calculated according to the child support guidelines.

## III.

[¶ 34] Hager argues for the first time in this appeal that the trial court erred when it ordered him to pay the cost of the paternity testing. He contends that the District Court had before it ample evidence that he was indigent and that the District Court's finding that Hager was unable to pay any child support at the time of the hearing compelled the court to relieve him of the burden of paying for the paternity tests.

7. Hager's assertions, if true, suggest that Hampson, and possibly Hager, may have defrauded the Department by applying for and accepting benefits from it at the same time that the child's father lived with and provided support for their son.

[¶ 35] "An indigent alleged father is not liable for reimbursement of the cost of [paternity] tests." 19 M.R.S.A. § 521(2)(J)(1)(c) (Supp.1993). Although the District Court had before it sufficient evidence from which it could have concluded that Hager was indigent, Hager never raised the issue of section 521(2)(J)(1)(c). Accordingly, because Hager never gave the court the opportunity to decide this issue, he has failed to preserve it. *See Farley v. Town of Washburn,* 1997 ME 218, ¶ 5, 704 A.2d 347, 349.

The entry is:

Judgment vacated as to the amount of debt owed by the defendant for past support and medical expenses, and remanded to the Superior Court for remand to the District Court for further proceedings consistent with this opinion. Judgment affirmed as to the amount the defendant owes for the paternity tests.